# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 6, 2008

Charles R. Fulbruge III
Clerk

No. 07-30361

BOARD OF TRUSTEES NEW ORLEANS EMPLOYERS INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO PENSION FUND; P & O PORTS LOUISIANA INC

Plaintiffs-Appellants

v.

GABRIEL, ROEDER, SMITH & COMPANY; THEORA BRACCIALARGHE

Defendants-Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:05-cv-01221

Before KING, STEWART, and PRADO, Circuit Judges.

PER CURIAM:[*]

Plaintiffs-Appellants Board of Trustees of the New Orleans Employers International Longshoremen's Association, AFL-CIO Pension Fund and P&O Ports Louisiana, Inc. (collectively, "Plaintiffs") appeal the decision of the district court ruling that Defendants-Appellees Gabriel, Roeder, Smith & Company

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

("GRS") and Theora Braccialarghe ("Braccialarghe") (collectively, "Defendants") did not commit actuarial malpractice. For the following reasons, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiffs administer a Pension Plan (the "Plan") that provides retirement benefits to eligible employees of various employers. The collective bargaining agreement requires each employer to make contributions to the Plan. If, in a particular year, the Plan's liabilities exceed its credits, then the employers must provide a "minimum required contribution." A Board of Trustees (the "Board"), comprised of five "management" trustees and five "labor" trustees (whom the respective groups appoint), administers the funds and determines how to allocate the employers' contributions.

GRS, an actuarial firm, provided the Plaintiffs with actuarial services from 1976 until June 2004, when the Plaintiffs terminated GRS's services. Braccialarghe, a senior consulting actuary at GRS, served as the Plan's enrolled actuary from approximately 1980 until 2004. In her role as the Plan's actuary, Braccialarghe prepared actuarial valuation reports for each fiscal year. On March 27, 2002, Braccialarghe presented to the Board a draft actuarial valuation report for the fiscal year ending October 1, 2001. The draft report indicated that the Plan had a beginning credit balance of approximately $9 million, but that without that credit, the employers would have had to make a "minimum required contribution" of over $6 million. This liability was a direct result of the stock market's decline. As a result of this information, and pursuant to Braccialarghe's recommendation, the Board voted to adopt a "smoothing" valuation method, which deferred the investment losses and apportioned them over the next five years. All of the parties agree that Braccialarghe's advice to adopt a five-year smoothing valuation was sound given her annual report and the market's decline.

At that same Board meeting, the Board discussed a proposal from the "labor" trustees to implement a lump sum benefit that would allow eligible employees to elect a lump sum payment of a portion of their retirement benefits. Prior to that meeting, the Plan's administrator had asked Braccialarghe to provide a cost analysis of implementing a lump sum benefit. Braccialarghe stated that the Plan would incur an additional liability of approximately $6.5 million should all eligible employees opt to receive the proposed 25% lump sum payment. The five "management" trustees opposed implementing the lump sum option, creating a deadlock on the Board. Under the terms of the Plan Trust, when the Board is deadlocked the matter is submitted to arbitration. In November 2002, Braccialarghe testified at the arbitration hearing. Braccialarghe stated that she agreed with the opinion of an actuary that the "management" trustees had hired, who had warned that even without adopting the lump sum benefit, the Plan's "minimum required contribution" would reach $10 million in 2004, and that the lump sum benefit would increase the amount employers would have to contribute. Braccialarghe further expressed hesitance regarding whether the Board should adopt the lump sum proposal, but she did not explicitly advise the Plan against doing so. The arbitrator ruled that the Board should adopt the lump sum benefit on a temporary basis, but only up to 10% instead of 25%.

Separate from the lump sum issue, in 2001 and 2003 Braccialarghe performed a cost analysis for the Board regarding its proposal to increase the amount of a Supplemental Benefit the Plan provided to eligible participants. Although Braccialarghe provided an analysis of the cost of increasing this benefit, again she did not explicitly advise the Board not to adopt the proposal. The Board adopted a temporary increase in the Supplemental Benefit in 2001 and extended the increase in 2003.

The Plan continued to suffer financial losses. In June 2004, the Plan terminated GRS's and Braccialarghe's services. On July 9, 2004, Braccialarghe wrote a letter to the Board asking that it reconsider its decision to terminate her services. Instead of rehiring Braccialarghe, the Plaintiffs brought suit against the Defendants, alleging professional negligence, negligent misrepresentation, and violations of the Louisiana Unfair Trade Practices Act. Specifically, the Plaintiffs alleged that Braccialarghe failed to advise the Plan on market volatility issues, failed to advise the Board and Plan administrator that the Plan could not afford the lump sum benefits proposal, and failed to share her actuarial opinion with the arbitrator that the Board should not adopt the lump sum proposal. The Plaintiffs voluntarily dismissed their claims under the Louisiana Unfair Trade Practices Act, and the remaining claims proceeded to a bench trial.

At the close of the Plaintiffs' evidence, the Defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 52(c),[1] arguing that the Plaintiffs had filed their case outside of Louisiana's one-year prescription period and that, in any event, the Defendants were not liable. See LA. CIV. CODE ANN. art. 3492 (stating that "delictual actions," which include actuarial malpractice, are subject to a "liberative prescription of one year. This prescription commences to run from the day injury or damage is sustained."). The district court determined that the Defendants were not entitled to judgment

---

[1] Rule 52(c) provides:

> Judgment on Partial Findings. If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

on the issue of prescription. The court explained that although a one-year prescription period applies to this case, the Defendants' alleged activities "could reasonably be characterized as a continuing tort." The court therefore entered judgment as a matter of law on the prescription issue in favor of the Plaintiffs. The district court also denied the Defendants' motion for judgment as a matter of law that the Defendants were not liable, stating that "the record must be completed before the Court is able to rule on the issue of liability." At the close of the evidence, the district court ruled in favor of the Defendants on all counts, finding that Braccialarghe did not breach the standard of care applicable to actuaries and that the Plaintiffs suffered no harm as a result of the Defendants' alleged tortious conduct. The Plaintiffs appeal this judgment. We have jurisdiction over the district court's final order pursuant to 28 U.S.C. § 1291.

## II. STANDARD OF REVIEW

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo." Water Craft Mgmt. LLC v. Mercury Marine, 457 F.3d 484, 488 (5th Cir. 2006) (internal citation omitted). A finding is clearly erroneous if it is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or this court is convinced that the findings are against the preponderance of credible testimony. Id. "Reversal for clear error is warranted only if the court has a definite and firm conviction that a mistake has been committed." Id. (internal quotation marks and citation omitted).

## III. DISCUSSION

A.    The district court did not issue contradictory rulings

The Plaintiffs rest the bulk of their appeal on the notion that the district court contradicted itself by ruling that the Defendants' actions constituted a "continuing tort" for purposes of the prescription period but also that the Defendants are not liable for negligence. The Plaintiffs' argument is that the

district court already found that the Defendants committed a tort when deciding the prescription issue, and that therefore the court could not have ruled the opposite way when considering the Defendants' liability. What the Plaintiffs fail to recognize, however, is that the court did not actually make a ruling on liability when it construed the Plaintiffs' suit as alleging a continuing tort.

The district court, sitting in diversity, followed Louisiana law, which states that even though a one-year prescription period applies, when the "damaging conduct is of a continuous nature, prescription does not begin to run until the date of the last harmful act." Orthopaedic Clinic of Monroe v. Ruhl, 786 So. 2d 323, 328-29 (La. Ct. App. 2001) (internal citation omitted). The district court ruled:

> The motion for a judgment as a matter of law by the defendants on the liability issue is denied.
>
> As to the prescription issue, however, I'm going to dismiss the defense of prescription and enter a judgment as a matter of law under Rule 52. Obviously, a one-year prescriptive period applies. The defendants have argued that because suit was filed April 1, 2005, the case has prescribed because one of several different periods which is longer than the year—November of 2002, March of 2002, August of 2003—are dates at which the trustees knew or should have know [sic] of any problem they are complaining about. However, the Court finds that under the authority of Orthopedic [sic] Clinic of Monroe v. Ruhl that this is in the nature and can be reasonably characterized as a continuing tort. Therefore, the Court finds that the last act by Ms. Braccialarghe was, in fact, July 9, 2004, when she wrote a letter expressing her disappointment regarding the termination and asking, basically, for reconsideration.
>
> So I'm going to dismiss the prescription issue raised by the defendants, and I'm dismissing the motion for a judgment as a matter of law on the liability issue because I believe that the record must be completed before the Court is able to rule on the issue of liability.

(emphasis added). Under the court's plain language, therefore, it deferred a decision on the issue of liability while construing the Plaintiffs' allegations as

involving a continuing tort. The district court simply denied the Defendants' motion to enter judgment as a matter of law on the defense of prescription; the court was clear that it did not intend to rule on the Defendants' liability at that time. The Plaintiffs have provided no authority for the proposition that a ruling on one issue (prescription) is conclusive on an entirely separate issue (liability).

Moreover, the case that the district court relied upon, Ruhl, belies the Plaintiffs' argument. Ruhl also involved a claim of actuarial malpractice. 786 So. 2d at 326. In that case, the Louisiana Court of Appeal considered whether the trial court erred in finding that the one-year prescription statute did not bar the plaintiffs' claims. Id. at 328. The court applied the continuing tort doctrine and affirmed the trial court. Id. at 328-29. In so doing, the court recognized that even though the alleged acts were of a continuous nature, the plaintiffs still had to prove negligence and damages. Id. at 329. The court concluded that "if proven, the series of negligent acts by [the defendant] would have continued to compound plaintiffs' damages." Id. (emphasis added). Thus, the court did not assume that the defendants were liable for negligence merely because the court found that the continuing tort doctrine applied. Id. Instead, the court went on to consider whether the defendant was in fact liable to the plaintiffs. Id. at 329-30; cf. King v. Phelps Dunbar, LLP, 743 So. 2d 181, 188-89 (La. 1999) (vacating the lower court's ruling that the prescription period barred the plaintiff's claims and remanding for trial on the merits of whether the defendants' conduct created a continuously hostile work environment). In the same way, the district court here simply ruled that the Plaintiffs could move forward with their suit because the Plaintiffs alleged acts, which, if negligent, were in the form of a continuing tort. Admittedly, the court did not use the exact words "if proven, would be a continuing tort," but we have no trouble in finding that that is exactly what the court meant. As the district court's ruling on this point is not even remotely

ambiguous, the Plaintiffs' argument that the court's rulings are inconsistent is without merit.

B. The district court correctly found that the Defendants did not breach the Actuarial Standard of Practice

The Plaintiffs' second contention on appeal is that the district court clearly erred in finding that Braccialarghe did not breach her duty to the Plaintiffs, because the court improperly found that her conduct adhered to the relevant Actuarial Standard of Practice ("ASOP"). The parties agree that the ASOP provides the scope of Braccialarghe's duty to the Plaintiffs. ASOP No. 4, Section 5.8 ("Section 5.8") provides:

> Actuary's Responsibility—A fundamental consideration in a funding program is the extent to which assets can reasonably be expected to ultimately exceed or fall short of the value of accrued benefits.

> This standard indicates that the actuary does not have complete responsibility for each element of the pension funding and cost allocation decisions, but shares responsibility for certain elements with the plan sponsor, attorney, and statutory authorities. Nevertheless, the actuary remains responsible for assessing the implications of the overall results, in terms of short- and long-range benefit security and expected cost progression.

> The extent to which benefits of a plan should be funded in advance of the date when they must be paid is a decision to be made by the plan sponsor, with the assistance of the actuary, in light of many factors, including regulatory requirements, collective bargaining considerations and alternative uses of money.

Actuarial Standards Board, Actuarial Standard of Practice No. 4, at 14 (1993). Ultimately, we must decide whether the district court clearly erred in concluding that this standard simply required Braccialarghe to provide a cost analysis of the proposed additional benefits, or if the standard also required her affirmatively to state her opinion on whether the Board should adopt the proposals.

The Plaintiffs rely on dictionary definitions of the words in Section 5.8 to claim that the standard required Braccialarghe to tell the Board that the Plan could not afford to pay for the new benefits.[2]  The Plaintiffs argue that the sentence "Nevertheless, the actuary remains responsible for assessing the implications of the overall results, in terms of short- and long-range benefit security and expected cost progression" gave Braccialarghe an affirmative duty to tell the Board of her opinion regarding the "implications" of adopting the new benefits.  Id.  What the Plaintiffs fail to recognize, however, is that the next sentence of Section 5.8 puts an actuary's duty into context: "The extent to which benefits of a plan should be funded in advance of the date when they must be paid is a decision to be made by the plan sponsor, with the assistance of the actuary . . . ."  Id. (emphasis added).  Moreover, Section 5.8 states that the actuary does not have "complete responsibility" for the Plan's actions.  Id.  Thus, the ultimate decision on whether to adopt a particular benefit proposal rests with the plan sponsor, here the Board, and not the actuary.  The actuary must provide the plan sponsor with a cost progression analysis, but she need not make the final decision for the Plan.

Properly construed, Braccialarghe did all that Section 5.8 required.  She prepared and presented estimates regarding the actuarial cost of paying the additional benefits.  She also advised the Board that in making its decision, it should take into account the market decline.  Indeed, the record reflects that the Board knew of the market's recent volatility given its decision to adopt the "smoothing" valuation method.  Braccialarghe objectively presented her reports to the arbitrator, even expressing hesitation regarding whether the Board should adopt the proposed lump sum benefit.  Once Braccialarghe provided the Board

---

[2] We note that the Plaintiffs have provided no authority, beyond a strained reading of the words, that construes Section 5.8 in the way they suggest.  Indeed, there are no reported federal or state cases that analyze Section 5.8.  Therefore, we must simply read the plain language of the standard to determine its meaning.

with an accurate actuarial cost projection and informed the Board of the recent market decline, she met her duty under Section 5.8. The Plaintiffs have no support for their claim that Section 5.8 also requires an actuary to inform the Board of the actuary's personal opinion regarding a proposed benefit. In light of the plain language of Section 5.8 and the record of Braccialarghe's conduct, the district court did not clearly err in ruling that Braccialarghe properly assisted the Plan in making its decision about whether to adopt the new benefits.

## IV. CONCLUSION

At its core, this case involves the Plaintiffs' regret at making a decision to increase benefits, because these new benefits came at a financial loss to the Plaintiffs. The Plaintiffs seek to point the finger at Braccialarghe, even though Braccialarghe provided the Board with an accurate actuarial cost assessment of adopting the benefit increases. The Plaintiffs' attempt to deflect the blame for the Board's own ill-fated decision and the result of the arbitration is unavailing. When considering the proposals, the Plaintiffs had received (and presumably understood) Braccialarghe's accurate cost analysis and knew of the recent market decline, and there is nothing to suggest that Braccialarghe owed a greater duty to discourage the Board from adopting the new benefits. As such, we AFFIRM the decision of the district court in favor of the Defendants.[3]

AFFIRMED.

---

[3] Because we affirm the district court's ruling on the issue of Braccialarghe's duty, we do not reach the Plaintiffs' additional arguments that the district court erred in ruling that the Defendants did not cause the Plaintiffs' damages or that the court improperly failed to assess the Defendants' degree of fault under Louisiana's comparative fault statute.