# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 12-30823

————

United States Court of Appeals
Fifth Circuit

**FILED**

January 15, 2014

Lyle W. Cayce
Clerk

CITY OF ALEXANDRIA,

　　　　Plaintiff - Intervenor Defendant - Third Party Plaintiff - Appellee Cross-Appellant

v.

BRIDGETT BROWN,

　　　　Intervenor Plaintiff - Appellant

v.

C L E C O CORPORATION; ET AL,

　　　　Defendants


JACQUES ROY; CHARLES E. JOHNSON, JR.,

　　　　Intervenor Defendants - Appellees


H. CRAIG DAVIDSON, JR.,

　　　　Third Party Defendant – Appellant Cross-Appellee

————

Appeals from the United States District Court
for the Western District of Louisiana

————

No. 12-30823

Before STEWART, Chief Judge, and DeMOSS and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Attorneys Bridgett Brown and H. Craig Davidson appeal, and the City of Alexandria, Louisiana cross-appeals, the district court's determination of the fees owed by the City to Brown and Davidson for representing the City. For the following reasons, we AFFIRM the district court.

## **Facts and Proceedings**

In 2004, the City of Alexandria, suspecting that it was being overcharged for power, hired Energy Management Services ("EMS") to audit the City's energy contracts. At that time, the City purchased electricity through three suppliers: the Cleco Corporation, the Louisiana Energy and Power Authority, and the Southwestern Power Association. The City also possesses its own power plant—D.G. Hunter—which, though old and inefficient, the City would run when cost effective. The City's initial contract with EMS promised EMS 50% of whatever recovery the City obtained from overcharging energy suppliers.

But when EMS tried to obtain records from Cleco in order to perform the audit, Cleco had EMS thrown off its property. At that point, the City realized that it needed to hire a team of lawyers to obtain the necessary records from Cleco, and if necessary, pursue its claims. The City wanted to hire its lawyers on a contingency basis out of fear of the costs of protracted litigation.[1]

A. The City Hires a Legal Team

The City's first hire was Bridgett Brown. Brown practices in Alexandria. She devotes half her practice to criminal defense and the other half to

---

[1] The costs of hiring the legal team on a contingency ultimately resulted in EMS having to lower its contingency fee from 50% of any recovery to 20% of any recovery so that the City's total contingency fee to all parties would not exceed 50%.

No. 12-30823

miscellaneous civil cases. Brown knew then-City Attorney Kelvin Sanders well, having shared office space and split fees with him on personal injury, criminal, and family law cases. City Attorney Sanders testified that he hired Brown because he "trust[ed] her instincts as a lawyer," as well as for her trial attorney skills, knowledge of local juries, and her contacts with the City Council. City Attorney Sanders also testified that Brown helped investigate the City's claims against Cleco, vet candidates to join the litigation team, and keep the City Council informed as to the status of the lawsuit. There was a lot, however, that Brown did not bring to the table: she had minimal experience in commercial litigation, and "knew nothing," as the district court noted, "about the complexities of utilities litigation, regulations or rules of the Federal Energy Regulatory Commission, or any of the other technical matters." Notwithstanding Brown's lack of experience in utilities litigation, her employment contract was authorized by the City Council—as the City Charter requires—in July 2005. Brown's contingency contract gave her a 10% share of any recovery.

After hiring Brown, City Attorney Sanders began looking for experts in energy law to lead the City's litigation effort. Sanders's search initially led him to H. Craig Davidson. At the time he was approached by Sanders in August 2004, Davidson had just opened his own solo practice in Baton Rouge. And though Davidson's new solo practice was a general practice firm that handled a wide variety of issues from transactional work to litigation, before going out on his own, Davidson had previously done extensive energy work as an associate for Baton Rouge attorney John Sharp. While working as an associate for Sharp on utility matters, Davidson was billed out at $350 an hour.

Davidson, in turn, recommended that the City hire Sharp. Though now disbarred, Sharp was at the time a very successful Louisiana energy lawyer

3

with a busy practice, and had experience in representing electrical cooperatives against Cleco.

The City hired Sharp and Davidson in a single contract even though they worked for different firms. The intent behind doing so is disputed by the parties; the City claims that the Sharp/Davidson contract was a joint obligation and/or venture, but Sharp and Davidson claim that the joint contract simply was done as a convenience to the City, and that the true intent behind the contract was to hire Sharp and Davidson separately to 10% contingencies. What is undisputed is that the contract was concluded in haste, the contract refers to Sharp and Davidson collectively as "Attorney," the contract awards Sharp and Davidson a 20% contingency, and the contract was authorized by the City Council in July 2005.

The City's last hire was Phillip Hunter, an Alexandria-based plaintiff's attorney. City Attorney Sanders claims that he hired Hunter for his contacts with city officials, as well as his trial skills. Hunter subsequently resigned from the representation, and raises no claim to attorney fees now.

B. The City Files Suit

Cleco did not take the City's decision to hire a litigation team lying down. The company mounted an aggressive effort to persuade the City not to file suit. Cleco also sued EMS, as well as two EMS employees (David Pugh and Sam Sansing) in Louisiana state court. Cleco claimed that EMS, Sansing, and Pugh violated non-disclosure agreements with Cleco by providing information regarding Cleco overcharges to the City (Pugh and Sansing were former Cleco employees). EMS, Sansing, and Pugh then counterclaimed. Then Alexandria attorney—and now current mayor of Alexandria—Jacques Roy, as well as his father, represented Sam Sansing in the *Cleco v. EMS* litigation.

While Roy's representation of Sansing in the *Cleco v. EMS* state court litigation would eventually become the subject of controversy, in the short run,

No. 12-30823

Cleco's efforts to block the City's planned litigation were unsuccessful. The City filed suit against Cleco in Louisiana state court in June 2005, and Cleco removed the case to the Western District of Louisiana later that month.

Sharp and Davidson drafted the petition. Brown reviewed the petition but did not, according to her testimony at trial, add "any document, section, sentence, comma, period, or word" to the petition. Instead, she claims that her major contribution was helping to convince the City to file suit, though Davidson undoubtedly also played an important part in doing so. All four attorneys signed the petition.

After the suit was filed, each attorney on the litigation team played a different role. Sharp acted as lead counsel, and had the "final word on all pleading and litigation strategies." Davidson acted as the senior associate. He facilitated communications, managed correspondence, and participated in the mediation process. Brown's role is much less clear. She did not principally draft any letter, interrogatory, or request for production during her time on the case. Brown nonetheless claimed in her lodestar submissions to the district court that she spent 1,650 hours (approximately 12-15 hours a week) on the case. She claims that her primary duties were to keep the City Council informed, and to discuss the case with Davidson and City Attorney Sanders. She also claims credit for participating in the selection of a consultant and an auditor to quantify the City's losses.

C. A New Mayor Is Elected

While representing Sam Sansing—but not EMS or its principal David Pugh—against Cleco in the *Cleco v. EMS* state court litigation, Jacques Roy also ran for Mayor of Alexandria. Roy won the election, and was sworn into office in December 2006. As he was not a neophyte to litigation with Cleco, Roy took an active role in the litigation, as did the new city attorney, Charles Johnson. The transition between administrations did not go as smoothly for

No. 12-30823

Bridgett Brown, though the City's and Brown's accounts of what happened vary substantially.

City Attorney Johnson alleges that shortly after taking office Brown called his office and engaged in a profanity-laced rant about how he needed to get the "M-F white boys" Sharp and Davidson under control because Sharp and Davidson were not communicating with her regarding the status of the case. Johnson also reports that he was told by Sharp that Brown had directed a racial epithet towards former City Attorney Sanders at an earlier lawyers' meeting. For his part, City Attorney Saunders testified during the trial that "[s]he may have" directed a racial epithet towards him, and that "she's a colorful person."[2]

Though the other members of the Cleco litigation team did not report that they considered Brown's language to be a major disruption, Ms. Brown's other efforts to have Mayor Roy removed from the case were. Brown felt that the Mayor's representation of Sam Sansing in the state court *Cleco v. EMS* litigation meant that the Mayor had an ethical conflict barring his participation in the *City of Alexandria v. Cleco* suit. Brown informed the City Council of the conflict, and reportedly told the Mayor in no uncertain terms that he should recuse himself. Mayor Roy alleges that when doing so, Brown also told him that (1) "she ran the city," (2) he was a placeholder as Mayor, and (3) "some other comments which I wouldn't want to say in a federal courtroom." City Attorney Johnson testified that Brown told Mayor Roy, "F-U, white boy. I do not work for you. I work for the council. That seat you're in now, you're just keeping it warm." The Mayor also alleges that Brown told him that he

---

[2] Brown, City Attorney Johnson, and former City Attorney Sanders are black. Davidson, Mayor Roy, and Sharp are white.

could not go on a trip to Orlando to meet with the City's outside experts in the case.

Shortly after that incident, Johnson claims that he terminated Brown's contract without being directed to do so by the Mayor. Johnson terminated Brown via letter. Johnson's letter indicated that the firing was for cause because Brown's conduct violated Louisiana Rule of Profession Conduct 1.8(b) because she used "information relating to representation of a client to the disadvantage of the client." Johnson claims that he did not refer to the racial slurs or insubordination because the termination letter was a public document and did not want to "place over my signature something of that nature."

Brown alleges that she was fired not for her insubordination, but rather because the mayor had a financial interest in the case and he wanted to try to divert her contingency fee to EMS. To support her story, Brown points to an affidavit from one of the Mayor's supporters indicating that the Mayor mentioned to him that he would "get my money out of the Cleco case, either through my dad or something," as well as testimony from herself indicating that the Mayor approached her in order to persuade her into giving up her contingency contract. Brown claims that the Mayor tried to persuade her to quit so that her share of any contingency proceeds could be diverted to EMS. Brown alleges that in return the Mayor offered to put her on future cases.[3] Brown suggests that her concerns regarding the Mayor's conflict of interest increased when, after taking office, the Mayor took actions to limit the flow of information regarding the case to the City Council, at which point she believed that she was ethically obligated to inform the City Council of the issue. Brown alleges that the Mayor ordered City Attorney Johnson to fire her in retaliation

---

[3] After Brown was fired, the Mayor did not transfer her share of the contingency proceeds to EMS.

No. 12-30823

for informing the City Council of the conflict, and therefore her firing was without cause.

After being fired, Brown intervened in the suit to protect her fee, and thereafter amended her intervention twice to first add, and then clarify, claims of defamation; tortious interference of contract; and damages caused by harm to her business reputation, emotional distress, and aggravation of preexisting medical conditions.  The court stayed Brown's claims during the pendency of the Cleco litigation.

D. Mediation

Around the time of Brown's firing in February 2007 (the record is ambiguous as to the exact series of events), KPMG, the impartial court-appointed auditor, issued a draft report to the parties calculating the impact of Cleco's overcharges to the City.  The KPMG report helped to kickstart negotiations.  And after a year and a series of mediations, the City and Cleco signed a memorandum of understanding ("MOU") in May 2008.  The MOU set out a global framework for settling the case, and indicated that Cleco would provide the City with approximately $60 million in settlement.  But transitioning from the 2008 MOU to the 2010 settlement agreement proved to be a difficult problem.  And during that transition, the City hired an additional law firm, fired Sharp, and told Davidson to stand down.

In the Spring of 2008, the City hired Breazeale, Sachse and Wilson, LLP to act as lead litigation counsel should the case ever be tried.  The City's plan was to have Sharp and Davidson continue to mediate, while having Breazeale, Sachse prepare to litigate should settlement talks fail.  But that plan fell through shortly thereafter when Davidson discovered in August 2008 that the Louisiana Bar Disciplinary Counsel had recommended Sharp's disbarment for settling a personal injury case off-the-books, and then keeping the proceeds of the settlement from his partners until he was caught.  Davidson called City

8

No. 12-30823

Attorney Johnson and informed him of the development. Shortly thereafter, the City faxed Sharp a termination letter.

Sharp's disbarment also presaged the end of Davidson's active participation in the case. After terminating Sharp, City Attorney Johnson told Davidson to stand down. City Attorney Johnson did not think that Davidson could try the case alone as lead trial counsel, an assessment that was seconded by Davidson at trial. Johnson testified that he merely told Davidson to stand down on the case because Johnson did not want to humiliate Davidson by terminating him. Both the Mayor and City Attorney Johnson testified that they thought Davidson did good work on the case. Mayor Roy, in particular, testified that Davidson "especially over time, brought value, especially to me, in his representation."

After being told to stand down in August 2008, Davidson ceased performing significant substantive legal work on the case. But he was not required to withdraw from the case, and he did continue to perform a few tasks. For example, he received and responded to emails from the City Attorney, had phone conversations with the City's new counsel, helped to respond to a set of interrogatories, and, without being asked to do so, reviewed case documents.

E. Settlement

With the original contingency counsel removed, and with new hourly counsel continuing to press the case, Cleco and the City struggled to transform the 2008 MOU into a workable settlement agreement. The parties dispute on appeal the source of the delay, and their contributions to the ultimate settlement.

Brown and Davidson argue that though there were details to be hammered out, the case was more or less settled within the value of the MOU. As such, they suggest that when they left active participation in the case, they had already delivered to the City almost all the value it would obtain in the

9

litigation. The City, by contrast, claims that there were significant problems with the proposed settlement that substantially decreased its value for the City.

The first problem arose from the details of a proposed power supply agreement between the City and Cleco. To settle the case, the City and Cleco had to negotiate a new power supply agreement ("PSA"). John Sharp, still on the case at that point, drafted the first proposed PSA. But the City objected to many of the elements of the deal that Cleco wanted to include. In particular, Cleco wanted to provide the City with a lump sum payment of $29 million in exchange for the City granting Cleco the right to the capacity of City's D.G. Hunter power plant. Cleco desired to do so because doing so would (1) allow Cleco to avoid treating the payment to the City as a litigation settlement on its 10-K Report, and (2) D.G. Hunter's excess capacity would allow Cleco to sell a greater amount of power from its more efficient power plants (power providers have to keep a capacity reserve for emergencies). Cleco's demand, however, worried John Adranga, a Washington D.C.-based energy-law specialist hired by the City to assist in the ongoing negotiations, because Cleco was insisting on a default provision that would allow Cleco to recoup the entire $29 million lump sum if the City defaulted in the first thirteen years of the deal. Likewise, the City's challenge rights under the deal were sharply limited, and could have resulted in the City having to pay hundreds of millions of dollars to Cleco with little to no ability to challenge the charges.

The second problem with the early settlement framework arose from the ongoing economic crisis in the United States. Like everything else during the period, the commodities markets went into flux and declined. In turn, changing commodity prices decreased energy prices which decreased the value of the settlement for the City because the lower energy prices decreased the value of the power supply agreement to the City. The value of the proposed

power supply agreement for the City would decrease from around $60 million in Spring 2008 to $42 million in Spring 2009.

The City and Cleco were unable the bridge the gaps between their negotiating positions, and in 2009 the City filed a motion to reopen the case (the case was administratively closed during settlement discussions). The parties proceeded to discovery, and, with the trial date fast approaching, settled the case in February 2010. The final settlement—which differed markedly in many ways from the original power supply agreement that was discussed—had a settlement value of $50.7 million for the City. As such, even though the 2008 MOU played little to no role in the final settlement agreement, the value of the ultimate settlement to the City was within the value that Cleco agreed to pay in the 2008 MOU.

F. The Attorney's Fee Dispute

The settlement of the Cleco litigation brought the simmering fees disputes between the City and its contingency counsel back to the forefront. Brown's claims had already been filed, and when the Cleco litigation settled Sharp and Davidson demanded their full contingency fee from the City.

The City, rather than pay that fee, filed a third party complaint and a request for a declaratory judgment against Sharp and Davidson. The City's declaratory judgment action claimed the Sharp/Davidson contingency contract was void and/or unenforceable, and that Davidson and Sharp could recover only on the basis of *quantum meruit* and not the contracted-for contingency fee. In response to the City's complaint, Davidson counterclaimed for his fee, and Sharp filed a third-party complaint.

As such, the court was tasked with resolving:

- Brown's claims for her fees; tortious interference; defamation; and damages caused by harm to her business reputation, emotional distress, and aggravation of preexisting medical conditions.

- Sharp's claim for his fees.
- Davidson's claim for his fees.
- The City's declaratory judgment claim that the Sharp/Davidson contract was unenforceable and/or void.

The district court started by dismissing Brown's tortious interference and defamation claims. Finding that Brown's pleadings failed to state a claim of tortious interference, the court declined to exercise supplemental jurisdiction over her remaining tort claims. Brown does not appeal the district court's dismissal of her tort claims.

After the court granted the motion to dismiss Brown's tort claims, the City moved for partial summary judgment that City Attorney Johnson both had the authority to, and did, terminate Brown. The court granted the City's motion, and did so before allowing Brown to obtain discovery. The court found that City Attorney Johnson's termination letter to Brown clearly and unarguably constituted a termination of Brown's contract. Second, the court determined that Mayor Roy's potential financial interest in the case, as well as the potential that Mayor Roy ordered Brown's termination, went to the question of whether Brown was fired for cause—not whether Brown was fired. The district court accordingly reserved the question of whether Brown was fired for cause for trial. Finally, the court determined that under the Charter and the terms of the ordinance passed by the City Council authorizing Brown's hiring, the City Attorney had the power to fire Brown.

After discovery, the court held a six-day bench trial on Sharp's, Brown's, and Davidson's claims for fees. In its post-order, the Court awarded Brown $0, Sharp $700,000, and Davidson $1,300,000.

The district court's order took a harsh view of Brown's participation in the case, and awarded her no fees. The court first determined that Brown was "clearly" discharged for cause:

No. 12-30823

> Ms. Brown's discharge resulted from her having taken positions directly adverse to the mayor, her use of personal attacks on him, and her attempts to play politics with the council in ways that were directly adverse to the administration. She was not able to maintain that divided loyalty and responsibility required of a lawyer in a municipal representation.

The court then went on to find that "[w]hat 'work' she did was essentially non-productive, and certainly did not contribute anything of substantial value even while she was employed." In so finding, the court rejected Brown's claims that she had worked approximately 1,650 hours (approximately 12-15 hours a week) on the Cleco litigation. The court noted that Brown's calculation of her hours worked "was not constructed from any kind of contemporaneous time entries and is essentially worthless." Indeed, the only thing that the court apparently credited her for doing in the nearly two years that she was on the case was being "mildly helpful in convincing members of the administration and council that the suit had merit, at least enough to file it." But even then the court sharply qualified its view of her services, noting that "the degree and level of her actual involvement in" convincing the City Council to authorize the suit "remains quite unclear." Having determined that Brown was fired for cause and could not show that she had performed any useful work for the City, the court held that "[h]er representation, then, had a zero value for awarding attorney's fees which would be payable from the public fisc."

Next the court awarded Sharp $700,000. Rejecting enforcement of the contingency contract, the court instead calculated Sharp's award on the basis of *quantum meruit*. The court justified its choice of *quantum meruit* analysis by explaining that Sharp's

> own misconduct and disbarment also acted as an impediment to his completion of the case and required the city to retain new counsel, rework the entire case strategy and progress, and incur very substantial

attorney's fees with replacement counsel. In our view the only way to compare apples to apples here is to consider all the factors in making a *quantum meruit* calculation.

In then calculating the *quantum meruit* award due Sharp, the court noted the maximum value of Sharp's contingency contract ($5.07 million), the amount of Sharp's proposed lodestar calculation ($1,124,700), and the amount that the City paid Sharp's replacement to litigate the case to settlement ($1,522,691.15). The court then considered those amounts in light of "all the factors" relating to the value of Sharp's representation, including the factors set out in Louisiana Rule of Professional Conduct Rule 1.5(a). As a positive factor supporting a higher monetary award, the court highlighted that Sharp's representation "did have value" for the City because Sharp succeeded in "getting the case to a point, even though not a final point" for the City. But the Court also noted that multiple points in the record (Sharp's disbarment, "attitude," and "lack of deference to the City's strategy") supported a lower award. The court found Sharp's behavior during the settlement talks, wherein he "began to think he was in charge of whether the City would settle or not," to "have been a particularly negative factor" in determining the amount owed. The court then balanced the positive and negative factors and decided that the City owed Sharp $700,000.

Finally, the court determined that Davidson deserved a higher fee than either Brown or Sharp, and awarded Davidson $1.3 million. A threshold question that the court had to address was the continuing validity of the contingency contract. Rather than signing separate contingency fee contracts, Davidson and Sharp signed a joint contingency fee contract that provided for a 20% fee with no indication as to how the fee was supposed to be split between Davidson and Sharp. The City accordingly challenged the continuing validity of Davidson's contingency contract in light of Sharp's disbarment, arguing that

14

No. 12-30823

Sharp's disbarment made Davidson's and Sharp's joint, indivisible obligation to act as lead counsel in the litigation impossible, and further that the contingency contract represented a joint venture that terminated when the City terminated Sharp. The City also argued that the agreement violated Louisiana Rule of Professional Conduct 1.5(e), which provides that a "division of fee between lawyers who are not in the same firm may be made only if . . . the client agrees in writing to the representation by all of the lawyers involved, and is advised in writing as to the share of the fee."

The district court rejected the City's joint obligation arguments, finding that the City's behavior was inconsistent with characterizing the contract as a joint obligation or venture because the City did not formally terminate Davidson even after firing Sharp. Instead, the district court determined that the joint fee, when combined with Sharp's withdrawal, meant that Davidson could not enforce the contingency contract:

> Mr. Sharp's and Mr. Davidson's contract was twenty percent (20%) for two lawyers without any clause dealing with the eventuality that one of them would be lost. . . . [T]hose anomalies are sufficient under the law to turn Mr. Davidson's calculated fee into a *quantum meruit* calculation as well, rather than a strictly enforced contingency fee award. To rule otherwise would require us to attempt a fictional contract reformation or to attempt to divide it to some percentage of shared money. This is so, because Mr. Sharp is not entitled to a contingency fee and there is no severability provision in the contract.

The court did not address the City's arguments with respect to Rule 1.5(e).

When applying *quantum meruit* analysis, the court found Davidson's claim to be "entirely different" from Sharp's and Brown's because "Davidson was never discharged," "brought good skills to the representation," "participated fully in the mediation process," and "poured numerous hours into

15

the case." And no one at the bench trial, noted the court, "had anything bad to say about him."

Moreover, even though the court did not enforce the contingency contract, the court nonetheless increased Davidson's *quantum meruit* award beyond Davidson's base lodestar calculation. Davidson's base lodestar calculation, which was arrived at by multiplying his claimed hours worked by an hourly rate of $350, and then increasing that figure by 20% to reflect underbilling, was only $1,026,375. But the court ultimately awarded Davidson $1,300,000—a nearly $275,000 premium over the lodestar amount—because of the "preclusion of other employment by Mr. Davidson during the time he was involved in the litigation, the amount at issue, the novelty and difficulty of the questions presented, and the nature and length of the professional relationship between . . . Davidson and the City." As such, by considering the amount at issue, and then accordingly increasing the award beyond the amount that Davidson claimed he was due based upon his billable hours and rate, the court gave Davidson part of the benefit of his contingency contract even though the court did not enforce the contract in full.

Brown, Sharp, and Davidson all appealed the fee awards, and the City cross-appealed as to Sharp and Davidson. Sharp and the City have since settled, leaving only Brown's and Davidson's appeals, and the City's cross-appeal as to Davidson remaining.

## Standard of Review

This court reviews a grant of summary judgment de novo. Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *Pustejovsky v. Pliva, Inc.*, 623 F.3d 271, 275-76 (5th Cir. 2010). No genuine

issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court views the facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment may be affirmed on any basis raised below and supported by the record. *QBE Ins. Corp. v. Brown & Mitchell, Inc.*, 591 F.3d 439, 443 (5th Cir. 2009).

With respect to the district court's post-trial order, this court reviews the district court's legal determinations de novo and its factual findings—provided that the district court applied the proper legal standard—for clear error. *Arete Partners, L.P. v. Gunnerman*, 594 F.3d 390, 394 (5th Cir. 2010). Should the district court apply the wrong legal standard in making its factual findings, this court then reviews the district court's factual findings de novo. *Shafer v. Army & Air Force Exch. Serv.*, 376 F.3d 386, 396 (5th Cir. 2004). To determine whether a factual finding is clearly erroneous, this Court looks to see if the finding "is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or this court is convinced that the finding[] [is] against the preponderance of credible testimony." *Bd. of Trs. New Orleans Emp'rs Int'l Longshoremen's Assoc., AFL-CIO Pension Fund v. Gabriel, Roeder, Smith & Co.*, 529 F.3d 506, 509 (5th Cir. 2008). "Reversal for clear error is warranted only if the court has a definite and firm conviction that a mistake has been committed." *Id.*

When reviewing issues of state law, federal courts look to the law of that state's highest court. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007). In the absence of a final decision by the Louisiana Supreme Court, this court "must make an *Erie* guess and determine . . . how that court would resolve the issue if presented with the same case." *Id.* In making an *Erie* guess, this court "defer[s] to intermediate state appellate court

No. 12-30823

decisions, unless convinced by other persuasive data that the highest court of the state would decide otherwise." *Mem'l Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GMBH*, 524 F.3d 676, 678 (5th Cir. 2008) (internal quotation marks omitted).

## Discussion

A. Bridgett Brown

Brown advances two dominant issues of law on appeal: first, she argues that City Attorney Johnson lacked the authority under the Alexandria City Charter to fire her and therefore her contract was never terminated and she is owed her full fee; and second, she argues that even if she was terminated, the district court applied the wrong legal framework under Louisiana law to determine what she was owed on her terminated contract. Neither issue matters if Brown's representation was of zero value to the client.

First, Brown argues the she was never legally terminated by the City. But under Louisiana law, a lawyer cannot use contractual liability to circumvent the requirement that a lawyer can only charge a reasonable fee for services rendered. *See, e.g.*, *City of Baton Rouge v. Stauffer Chem. Co.*, 500 So. 2d 397, 401 (La. 1987). As such, a lawyer cannot collect on the full value of a contingency contract without having provided substantially all of the services envisioned under the original contract. *See, e.g.*, *Saucier v. Hayes Dairy Prods., Inc.*, 373 So. 2d 102, 116 (La. 1978) ("[P]ermitting a lawyer to reap in full measure the contracted-for fee provided in a contingency fee contract without providing all or substantially all of the legal services contemplated by the contract clearly violates the strictures of [the Rules of Professional Responsibility]."); *see also Cent. Progressive Bank v. Bradley*, 502 So. 2d 1017, 1017 (La. 1987). Because it is undisputed that Brown stopped working on the case after being terminated in 2007, Brown cannot collect the full value of her

18

fee even if she has a valid contract.[4]  She can, instead, collect only a reasonable fee for the work she did.  And if the district court properly determined that her representation did not advance her client's case, then she cannot collect a fee even if she has a technically valid fee contract and was fired without cause.

Second, Brown argues that the district court erred when it applied *quantum meruit* analysis rather than *Saucier* analysis when determining the fee owed Brown for the value of the work performed.  But Brown overlooks that the *Saucier* framework and *quantum meruit* analysis apply essentially the same factors to determine the contributions a lawyer made to a particular case. *Cf. O'Rourke v. Cairns*, 683 So. 2d 697, 702 (La. 1996) ("[T]he *Saucier* factors are, to a degree, the same factors used in making a *quantum meruit* award . . . .").  Under both *Saucier* analysis and *quantum meruit* analysis, a court is supposed to use the factors articulated by Louisiana Rule of Professional Conduct 1.5(a) to determine the contribution that a lawyer made to his client's case.  *See id.* at 702 & n.12 (*Saucier*); *State Dep't of Transp. & Dev. v. Williamson*, 597 So. 2d 439, 442 & n.9 (La. 1992) (*quantum meruit*).  That is why, for example, this court has previously indicated that a district court committed harmless error when it erroneously characterized an award as *quantum meruit* because the district court considered the *Saucier* factors when making its *quantum meruit* determination.  *See In re Calm C's Inc.*, 179 F. App'x 911, 914 (5th Cir. 2006) (per curiam) (unpublished).  And if both the *Saucier* framework and *quantum meruit* rely on the same factors to determine

---

[4] Brown tries to claim at points that since the value of the case (≈$60 million) was essentially set at the time she was fired, the successor counsel did not substantially advance the case and therefore she is owed most, if not all, of her contingency fee. But Brown's claims here are factually untenable under any standard of review.  Not only did *her contribution* to the representation do very little, if anything, to advance the case, but also the factual record clearly establishes that when Brown left the case there was still substantial work to be done before the City could realize the settlement value.

an attorney's contribution to a particular case, then the district court's determination that, under the factors set out by Rule 1.5(a), Brown's work had no productive value to her client prevents recovery under either *Saucier* or *quantum meruit.*

The district court's determination that Brown's legal representation had no value for her client presents Brown with a threshold issue that she needs to address before she can successfully raise her legal challenges. If Brown cannot show that the district court erred when it determined that her representation had no productive value to her client, then she cannot recover even if she prevails on her main legal challenges to the district court's orders. To evaluate Brown's challenge to the district court's factual findings we have to determine (1) the standard of review for challenging the district court's determination that her work had no net value, and (2) whether under that level of review, Brown's claim succeeds.

Factual findings by the district court are typically reviewed for clear error. Brown tries to do an end-run around the high barrier presented by clear error review by alleging that the district court's factual findings should be reviewed de novo because the district court applied the wrong legal standard when making its factual findings. But her attempted end-run fails because she does not successfully allege that the district court considered the wrong substantive factors in calculating the value of her representation. Under either *quantum meruit* or *Saucier* analysis, Brown's contribution to the case is determined by reference to the factors set out by Rule 1.5(a). Though Brown tries to argue that the district court erroneously considered that the fees were being paid by a municipality, it is apparent that the district court's decision was based on the sheer lack of evidence supporting Brown's claim for attorney fees rather than the fact that public funds were involved. Because Brown highlights no legal error with the district court's application of the factors set

out by Rule 1.5(a) to determine whether Brown's work has any value, we review the district court's determination that Brown's work had no value for clear error.

To prevail on a clear error challenge to the district court's findings of fact, Brown needs to show that (1) the district court's findings regarding Brown are "without substantial evidence to support" them, (2) the district court "misinterpreted the effect of the evidence," or (3) the district court's determinations were "against the preponderance of credible testimony." *Bd. of Trs. New Orleans Emp'rs Int'l Longshoremen's Assoc.*, 529 F.3d at 509. Moreover, as a practical matter, this clear error challenge is an uphill battle for Brown because of the combination of (1) the lack of any work product demonstrating Brown's contribution to a case, and (2) the presence of co-counsel who apparently did nearly all, if not all, of the work. We acknowledge Brown's point that she was neither hired for, nor expected to, draft briefs, prepare interrogatories, and engage in discovery correspondence, but nonetheless note that such written work offers courts tangible evidence of an attorney's contribution. Without concrete evidence of her contributions, Brown is forced to primarily rely on testimony from her political friends and allies to substantiate her contributions. And when the district court decides not to credit such testimony of her contributions, and instead chooses to accept the City's version of events, Brown is left with little evidence on which she can make a showing of *clear* error by the district court.

Brown tries to make that showing by highlighting various contributions that she alleges she made, such as helping to assemble the legal team, convincing the City to file suit, intervening to keep the case from being dismissed, researching potential auditors, and otherwise performing the task of local counsel. But we struggle with the extreme divergence between the hours that Brown claims to have worked on the case, and the near complete

21

lack of any evidence demonstrating any contribution she made during her representation of the City.  Sixteen hundred billable hours approaches the work done by many attorneys for an entire year, and the record here does not even come close to substantiating such an effort on Brown's part.  And her continued efforts to claim having performed such work cannot help but to call into question the veracity of all of her claims.

We conclude that the district court that has overseen this case for nearly a decade did not clearly err when determining that Brown's representation made no positive contribution to the City's litigation effort.  In many instances where she claims credit for advancing the case, the record is equally susceptible to being read to credit someone else on the litigation team.   City Attorney Sanders hired the legal team, Davidson convinced the City Council to file suit and interfaced with local officials, and Sharp researched the auditors.  And unfortunately for Brown, with respect to her claimed abilities to be a liaison with the City Council, we cannot look past the district court's findings—and the ample record evidence that supports them—that she actually increased tensions between the administration and the Council, both of whom were her clients, by "play[ing] politics . . . in ways that were directly adverse to the administration."[5]  As Rule 1.5(a)(4) indicates that a court should examine "the results obtained" through the lawyer's representation, and Rule 1.5(a)(6) indicates that a court should consider  "the nature . . . of the professional relationship with the client," we believe that, absent a clear contribution by *her* to the representation, Brown cannot claim credit for

---

[5] Even if Brown believed that the Mayor had a conflict of interest, that belief does not excuse unprofessional behavior in reporting a conflict of interest.

advancing her client's case when her representation was, at least in significant part, intentionally counterproductive.[6]

The district court's finding that Brown's representation of the City had no value presents Brown with a bar to recovery that she cannot overcome. Legal contracts are unique: a lawyer cannot be paid for work that she does not perform, and any payment for the work that the lawyer performs must be reasonable. The district court's post-trial finding that Brown's legal work brought the city no value was not clearly erroneous. Regardless of what Brown might have been able to sue for had she not been suing on a contract for legal services, because her performance under the contract was determined to have no value, she can recover no fee. We affirm the court's denial of attorney fees.

B.  H. Craig Davidson

Davidson's appeal and the City's cross-appeal take sharply different views of the district court's fee award. Davidson argues that he performed under a valid contingency contract, and he faults the district court for not awarding him his full contingency fee; the City argues that the district court properly refused to enforce the contingency contract, but faults the district court for awarding what it suggests is an excessive *quantum meruit* award. Though we apply slightly different reasoning than the district court in determining that the Sharp/Davidson contingency contract is unenforceable,

---

[6] Davidson's time sheets likely are Brown's best evidence regarding her potential contributions to the case. But Davidson's timesheets are insufficient to show that the district court clearly erred in determining that Brown's representation had no value. First, as the district court noted, Davidson's records were "likely not from contemporary time records," and therefore only "helpful to some degree" in determining fees. Second, Davidson's records are not broken out by task and give little indication as to the time Brown spent working on the case or any contribution that Brown made during that time. Though we agree that Davidson's time records suggest that Brown spent at least some *de minimis* amount of time working on the case, they do not substantiate that Brown made a positive, productive contribution to the representation particularly given the substantial evidence as to her counterproductive behavior while representing the City.

we ultimately agree with, and therefore affirm, the district court's *quantum meruit* award of $1.3 million to Davidson.

   1. Davidson Cannot Recover the Contracted-for Contingency Fee

   In an attempt to establish that the Sharp/Davidson contract was not enforceable, the City argues that Sharp and Davidson were the joint obligors of a single, indivisible object: acting as lead counsel in the City's claims against Cleco.  The City accordingly suggests that Sharp's disbarment also terminated the contract as to Davidson both because (1) performance under the original contract became impossible and (2) the Sharp/Davidson joint venture to act as lead counsel was terminated as a matter of law when the joint venture's partnership had been reduced to one.  Davidson counters by pointing out that (1) Brown's contract also contained a provision that she was lead counsel, (2) the City kept Davidson on the case even after Sharp was terminated, and (3) the City retained Breazeale, Sachse and Wilson, LLP to act as lead litigation counsel even before either Sharp was fired and Davidson was told to stand down.  The district court agreed with Davidson that the contract was neither a joint obligation nor a joint venture.  The court indicated that the City's argument:

> must fall because the city never dismissed or discharged Mr. Davidson when it dismissed Mr. Sharp. Indeed, the evidence is that Mr. Davidson was specifically told the City had no complaint with him and might be calling on him again, even though it did not. Even at trial no one had anything bad to say about Mr. Davidson. We do not interpret the contract in its reformed fee formation to be a joint venture contract, particularly in terms of its context.  The exception proves the rule here – Mrs. Brown's contract was for one lawyer at a ten percent (10%) contingency. Mr. Sharp and Mr. Davidson's contract was twenty percent (20%) for two lawyers without any clause dealing with the eventuality that one of them would be lost.

24

No. 12-30823

The district court applied the incorrect legal framework to determine whether the Sharp/Davidson contract set out a joint obligation.  The district court began its analysis with the City's decision not to terminate Davidson after Sharp was fired, and found that the City's behavior was determinative of the entire analysis.  But instead of starting with the City's reaction after Sharp's termination, the district court's analysis should have begun with the text of the contract.  "[T]he classification of an obligation as several or joint depends upon the parties' intentions and understanding, *as revealed by the language of their contract* and the subject matter to which it refers."  *Berlier v. A.P. Green Indus., Inc.*, 815 So. 2d 39, 47-48 (La. 2002) (emphasis added).  A court's determination as to whether a contract is several or joint should be guided by "the rules for the interpretation of contracts,"[7] which in Louisiana requires that "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."  La. Civ. Code. Ann. art. 2046.  Because the district court applied the improper legal framework in determining the parties' intent with respect to the Sharp/Davidson contract, and placed primary emphasis on a factor that the court could only consider if the contract was ambiguous, we review the court's determinations that the contract did not set out a joint, indivisible obligation de novo. *Shafer*, 376 F.3d at 396.

To determine whether the Sharp/Davidson contract created a joint obligation, we look to see "if through the" contract, Sharp and Davidson "promise[d] to render together one service to" the City.  5 La. Civ. L. Treatise, Law of Obligations § 7.21 (Westlaw 2d ed. 2013).  "When different obligors owe together just one performance to one obligee, but neither is bound for the

---

[7] *Shell Petroleum Corp. v. Calcasieu Real Estate & Oil Co.*, 170 So. 785, 788-89 (La. 1936).

whole, the obligation is joint for the obligors." La. Civ. Code. Ann. art. 1788. The text of the Sharp/Davidson contract unambiguously sets out a joint obligation. The contract refers to both attorneys as a singular entity, assigns them a single, joint task of "tak[ing] the lead role and controll[ing] all proceedings related to the Claims," and provides for a joint recovery of 20% without any clause dealing with the eventuality that Sharp or Davidson would be unable to complete the representation.[8] As in *Nabors v. Producers' Oil Co.*, where the Louisiana Supreme Court determined that a contract set out a joint obligation:

> the contract did not state the amount paid to each of [Sharp and Davidson], nor state the [performance owed] by each of them. They joined in one contract to do the same thing, in consideration for advantages to be derived for the common benefit of all of them. The language of the instrument leaves no doubt that their contract was joint and not severable. For example, the contract declares that the [attorneys] are to be hereinafter [collectively referred to as "Attorney"].

74 So. 527, 532 (La. 1917) (internal quotation marks omitted). Because we believe that the text of the contract unambiguously sets out the intent to create a joint obligation, "no further interpretation may be made in search of the parties' intent." La. Civ. Code. Ann. art. 2046. We accordingly do not address Davidson's arguments regarding the City's performance.

---

[8] Though Davidson does point out that the contract has a severability clause indicating that "[s]hould any term, provision, or part of this Agreement be found to be unenforceable or contrary to law, then the remainder shall be given full force and effect without the offending portions, or with such offending portions rewritten so as to give full effect to the parties' intent and cause for entering into the agreement," we believe that the clause concerns how the agreement should be interpreted should a provision be found to be contrary to law or unenforceable—not what constitutes performance under the contract by the attorneys should one of the attorneys be unwilling or unable to complete the representation.

No. 12-30823

"[T]o determine the effect of a joint obligation on the obligors, it is necessary to determine whether the joint obligation is divisible or indivisible." *Berlier*, 815 So. 2d at 47. "If the joint obligation is divisible, neither obligor is bound for the whole performance; rather, each joint obligor is bound to perform only his portion. On the other hand, if the joint obligation is indivisible, the joint obligors are subject to the rules governing solidary obligors." *Id.* (internal citation omitted). The divisibility of a joint obligation "depends on the divisibility of the object of the performance." *Id*. at 48. "An obligation is divisible when the object of the performance is susceptible of division." La. Civ. Code. Ann. art. 1815. "An obligation is indivisible when the object of the performance, because of its nature or because of the intent of the parties, is not susceptible of division." *Id*. We believe that the intent of the parties makes the Sharp/Davidson contract indivisible. The text of the Sharp/Davidson contingency contract makes the 20% fee for acting as the Attorney taking "the lead role" and controlling "all proceedings related to the Claims" *contingent* upon recovery through either a settlement or award. Accordingly, the parties agreed that Sharp and Davidson's obligation under the contract was to complete the *entire* representation and prevail before payment was due. As the Sharp/Davidson contract does not contemplate partial performance of the obligation by Sharp and Davidson, we believe it sets out an indivisible obligation.

In turn, our determination that the Sharp/Davidson contract sets out a joint, indivisible obligation means that, though we reach the result through a slightly different path, the district court properly declined to enforce the Sharp/Davidson contingency contract. When "a party sues on a certain contract to recover compensation due on its performance, he must show performance on his part, or a legal excuse." *Stockstill v. Byrd*, 132 La. 404, 407 (1913). Moreover, "the apportionment of acts of performance and

27

counterperformance within the framework of a single contract depends on whether the object of the performance that each party promised to render to the other is susceptible of division, which may very well depend on the intention of the parties, as clearly stated in the Louisiana Civil Code." 5 La. Civ. L. Treatise, Law of Obligations § 9.51. In the Sharp/Davidson contract, Sharp and Davidson promised to provide the services of *two* attorneys to the City in exchange for 20% of the recovery at the end of the litigation. But Sharp's disbarment put Sharp and Davidson "into a different position altogether from that contemplated by the terms of the contract." *Stockstill*, 132 La. at 409. Sharp's disbarment "rendered the contract impossible of performance" because Sharp and Davidson could no longer provide the services of two attorneys to the City. *Id.* Regardless of whether Davidson continued minimal work on the case after Sharp's disbarment, Sharp and Davidson were in default on their joint, indivisible obligation set out by the contingency contract, and could no longer claim the contracted-for contingency fee from the City. *Id.*

We appreciate Davidson's points that he was not responsible for the breach, was only sidelined after the breach, and was well-liked by all involved. Nonetheless, he drafted the contract creating the joint, indivisible obligation, and the value of his representation fell precipitously with Sharp's disbarment. It was Sharp who had the skills and experience to be lead counsel, and the City's replacement lawyers (to which the City had to transition the *entire* case, and not just the litigation portion) had their own set of senior associates, thereby removing any need for Davidson to continue substantial participation in the case. In such a situation, where there was only partial performance of a joint, indivisible obligation before default, we believe that Davidson's recovery must be in *quantum meruit*. *Cf.* 5 La. Civ. L. Treatise, Law of Obligations § 16.63 ("[I]f a contract is dissolved because of a fortuitous event

No. 12-30823

that occurred after an obligor has performed in part, the obligee is bound, but only to the extent that he was enriched by the obligor's partial performance.").[9]

2. The District Court's *Quantum Meruit* Award Was Proper and Reasonable

Both the City and Davidson challenge the district court's *quantum meruit* award of $1.3 million. Davidson argues that (1) the district court improperly applied federal, rather than, state law in determining the award, (2) the award was too low because the district court took account of the fact that the award was being paid for with public funds, and (3) the court should have awarded attorneys' fees and prejudgment interest. The City counters that the district court's *quantum meruit* award was too high. We reject both parties' challenges.

First, Davidson fails to explain how the district court actually applied federal, rather than state, law. Though the district court did refer to both the federal and state methods of calculating fees, the court's use of the lodestar calculations was just a helpful starting point in determining a *quantum meruit* award under Louisiana law.

Second, Davidson argues that the district court erred in considering that the award would be paid for with public funds. Our review of the record satisfies us that the district court analyzed each of the applicable factors in Rule 1.5(a). Even if the district court's consideration of public funds under Rule 1.5(a) was improper, we cannot say that we would have awarded Davidson a different amount under *quantum meruit* based on the record before us. *See Melendreras v. Blanchard*, 598 So. 2d 1226, 1228 (La. App. 4th Cir. 1992) ("The trial court is vested with much discretion in determining proper

---

[9] In light of our determination that the Sharp/Davidson contract sets out a joint, indivisible obligation that was not performed, we do not address the City's other challenges to the contract.

attorney fees in quantum meruit and [we] will not disturb that determination absent *manifest error*." (emphasis added)); *see also Rook v. Xerox Corp.*, 55 F. App'x 716, at *4 (5th Cir. 2002) (per curiam) (unpublished) ("[A]n appellate court may affirm even though the district court relied on the wrong reason in reaching its result." (internal quotation marks omitted)).

Third, Davidson's argument that the district court erred in failing to award prejudgment interest and attorneys' fees presupposes that Davidson is enforcing a valid contract. But because Sharp and Davidson did not perform the joint, indivisible obligation under the contingency contract, and Davidson is entitled only to a *quantum meruit* award, Davidson can neither invoke his *contractual* right to attorney's fees, nor, because legal interest in a *quantum meruit* suit is due only from the date of final judgment,[10] raise a claim for prejudgment interest. Accordingly, the district court did not err when refusing to award Davidson prejudgment interest and attorneys' fees.

Finally, the City does not demonstrate that the district court's *quantum meruit* award was excessive. The Louisiana Supreme Court has indicated that a court should consider the following factors derived from Rule 1.5(a) when determining a *quantum meruit* award:

> (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) amount of money involved; (5) extent and character of the work performed; (6) legal knowledge, attainment, and skill of the attorneys; (7) number of appearances made; (8) intricacies of the facts involved; (9) diligence and skill of counsel; and (10) the court's own knowledge.

---

[10] *See, e.g., McCarty Corp. v. Pullman-Kellogg, Div. of Pullman, Inc.*, 751 F.2d 750, 762 (5th Cir. 1985).

No. 12-30823

*Williamson*, 597 So. 2d at 442. The City argues that the district court's calculation is excessive in light of Davidson's lack of experience in utility cases, Davidson's arbitrary 20% increase in his lodestar calculation to account for unbilled hours, the fact that Davidson's award was greater than lead counsel Sharp's, the fact that Davidson's award results in an effective hourly rate of $443 an hour, and the fact that Davidson ceased performing a significant role in the case after August 2008. But Davidson had utility experience when he was hired, and had been billed out at $350 an hour doing that work. Given these facts, the district court could fairly award Davidson a *quantum meruit* award that had an effective hourly rate that was higher than his past hourly rates given that Davidson was working on contingency, and therefore was not only providing the City with legal services but also bearing the risk of loss for the City.

## Conclusion

We AFFIRM the judgment of the district court.

31