# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

September 18, 2019

Lyle W. Cayce
Clerk

No. 17-40752

CALVIN GARY WALKER; WALKER'S ELECTRIC; WALKERS ELECTRIC; JESSIE HAYNES,

    Plaintiffs - Appellants

v.

BEAUMONT INDEPENDENT SCHOOL DISTRICT; AARON COVINGTON; LEROY SALEME; VERNON BUTLER; JANE KINGSLEY; TERRY INGRAM; MICHAEL "MIKE" NEIL; TOM NEILD; VENICE MONROE; A. B. BERNARD; JIMMY SIMMONS; ROBERT TURNER; JOE DOMINO; LENNY CABARELLO; JACK CARROLL; BEAUMONT EXAMINER; DON DODD; JENNIFER JOHNSON; BEAUMONT ENTERPRISE; BROOKE CRUM; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS; LOCAL UNION 479, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS; STEVEN LISLE; DUWAYNE HERRMANN, also known as Dwayne Hermann; CHRIS KIBBY; DAVID GONZALES; WAYNE REAUD; MICHAEL GETZ; CORY CRENSHAW; MALCOLM BALES; JERRY JORDAN; BOB RAWLS; TIMOTHY BREWER; DEANNA STEVENS,

    Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Texas

Before SMITH, DUNCAN, and ENGELHARDT, Circuit Judges.

KURT D. ENGELHARDT, Circuit Judge:

With this appeal, we review the district court's dismissal of the entirety of Appellants' claims pursuant to the Texas Citizens' Participation Act, ("TCPA"), TEX. CIV. PRAC. & REM. CODE, §§ 27.001-27.011 (West) and Rule 12 of the Federal Rules of Civil Procedure. For the reasons stated herein, we

No. 17-40752

AFFIRM that dismissal as to all claims and all parties named herein as defendants.[1]

## BACKGROUND

Plaintiff Calvin Gary Walker ("Walker"), Walkers Electric, and Walker's Electric originally filed suit in July 16, 2015, in the United States District Court for the Eastern District of Texas, Marshall Division. The *Walker* action was consolidated, on February 23, 2016, with a related case, *Haynes v. Crenshaw, et al.* (civ. action no. 1:15-CV-437), filed by Plaintiff Jessie Haynes ("Haynes"). Following transfer from the Marshall Division to the Beaumont Division, Plaintiffs-Appellants ("Appellants" or "Plaintiffs") Walker and Haynes filed a consolidated Fourth Amended Complaint on December 22, 2015.

As set forth in the Fourth Amended Complaint, Appellants assert that they are the victims of an extensive, long-lasting conspiracy ("conspiracy" or "Conspiracy") designed to prevent African-American individuals in Beaumont from gaining power and influence in order to perpetuate "white dominion over Beaumont local politics." This conspiracy, spanning approximately a decade, allegedly involved approximately 35 residents and organizations in the Beaumont area, including the Beaumont Independent School District ("BISD"), the BISD Board of Trustees and subsequent BISD Board of Managers, two local newspapers and their employees, two online journalists, the local chapter of the International Brotherhood of Electrical Workers ("IBEW") and several of its members, a Beaumont City Councilperson, two

---

[1] As the record reflects, Appellants have asserted numerous claims against approximately 35 defendants. The Fourth Amended Complaint is 52 pages long and contains 222 numbered paragraphs.  In the interest of brevity, all natural persons will first be identified herein by their first and last names, and titles, if known.  Subsequent references to these persons shall be to only their last names.

No. 17-40752

local attorneys, the United States Attorney for the Eastern District of Texas, two Assistant United States Attorneys, and two agents with the Federal Bureau of Investigation ("FBI"). The objective of this alleged conspiracy was to ruin Appellants' reputations and businesses as part of a larger campaign to harm minority individuals who "stepped out of line" and "defied the status quo."

## I. **Walker**

Walker is a Master Electrician and owner of Walker's Electric Company, which offers electrical services in Beaumont. He asserts that the conspiracy against him began around 2004 when members of IBEW asked him to join and he refused, at which point he was told that the union would "get him one way or another." Walker then contracted to provide electrical services to the BISD, a position that had previously been held by an IBEW member. In April 2008, IBEW filed a complaint against Walker with the Texas Department of Licensing and Registration ("TDLR"), asserting that Walker had obtained his electrician's license through fraud. Although Walker initially contested the matter and continues to assert that IBEW was behind and heavily involved with the investigation, he ultimately agreed to pay a fine, relinquish his Master Electrician's license, and re-take the required licensing exam.

Walker asserts that IBEW then conspired with BISD board members to ruin Walker's reputation and business. According to Walker, the BISD board members complained at BISD Executive Cabinet meetings that he was making too much money for a minority and was a sloppy businessman. He additionally avers that BISD personnel sought to ensure that he did not get any other contracts with the BISD and imposed onerous record-keeping requirements upon him. Specifically, Walker contends that he, a black non-

union electrician, was the only contractor required to submit detailed invoices. He further alleges that, in 2008, BISD Chief Financial Officer Jane Kingsley, acting on behalf of the BISD, attempted (unsuccessfully) to ensure Walker's contract with the BISD was not renewed by illegally conducting the bid process.

Having failed to prevent Walker from contracting with the BISD, the IBEW and the BISD allegedly next turned to Malcolm Bales, the United States Attorney for the Eastern District of Texas, to prompt Walker's May 2011 indictment on 37 counts of fraud. In addition, Walker alleges that Deanna Stevens and Timothy Brewer—the FBI agents involved in his prosecution—tampered with potential witnesses during his trial, offering bribes to one and threatening two others. Members of the United States Attorney's Office also allegedly leaked information about Walker's case to members of the IBEW and the BISD. Walker was tried on the fraud counts in December 2011, which resulted in a hung jury and mistrial.

Subsequently, on July 17, 2012, Walker pleaded guilty to one count of willful failure to pay income taxes. He complains that members of the conspiracy, including members of the press and the BISD's Board of Trustees, thereafter relentlessly smeared him by wrongfully stating that he had pleaded guilty to defrauding the BISD and that he had agreed to repay it for the money that he had stolen. Walker asserts that, although the records of the BISD contained altered documents, there was no evidence admitted at trial that Walker or his wife submitted those documents to the BISD in connection with receiving payments for projects. Walker additionally alleges that Bob Rawls, the Assistant United States Attorney assigned to the case, urged the BISD to cease doing business with Walker and sent letters to a

No. 17-40752

number of government entities and individuals, falsely informing them that Walker was a thief.

Walker complains that members of the conspiracy continued to engage in a smear campaign against him and that BISD board members and other conspirators repeatedly stated that Walker had admitted to submitting fraudulent invoices. Walker further contends that members of this conspiracy joined with their media allies at *The Examiner*, The *Beaumont Enterprise*, and two websites to spread these allegedly unfounded allegations. Unidentified members of the conspiracy also purportedly interfered with Walker's existing contract with BISD by improperly terminating his contract in 2014. Accordingly, Walker alleges he was prevented from being awarded the BISD contract and lost substantial business from other prospective customers because the BISD's "Evaluation Matrix," prepared by BISD (Employee) Appellees – Leroy Saleme (BISD Chief Financial Officer), Aaron Covington (BISD Director of Contracts), and Vernon Butler (BISD Superintendent) – to compare contractors, falsely represented that he had admitted to padding BISD invoices, along with other purported falsehoods.

Walker further contends that the conspiracy has continued such that that United States Attorney Bales, unsatisfied with Walker's plea of guilty to willful failure to file income taxes, has conspired with the Jefferson County District Attorney Cory Crenshaw, a former Assistant United States Attorney, to form a joint task force in order to prosecute Walker in state court, despite the BISD's internal audit's having revealed he had not defrauded the BISD.

## II. Haynes

Haynes, too, allegedly was victimized by the conspiracy for supporting (former) BISD Superintendent Carroll Thomas. Specifically, she claims that BISD Board of Trustees member Michael Neil pushed her away from a door

leading to a press conference at BISD after she prevented Jerry Jordan, a journalist for SETInvestigates.com, from entering the press conference. Additionally, rather than Neil's being prosecuted for assault, Haynes was prosecuted and subsequently convicted in state court for obstruction of a public passageway. She additionally claims that, at her trial, at which Neil, Jordan, and City Councilperson Michael Getz (who was also present outside the press conference) testified, and Wayne Reaud, owner of the Beaumont *Examiner*, a Media-Appellee, was present, was a product of the RICO racketeering enterprise and conspiracy. She alleges "the Conspiracy engaged in a concerted campaign to harass [her], tarnish her reputation, attack her integrity, and threat[en] criminal and/or administrative repercussions." Also allegedly included in the campaign was Neil's attendance at an incident where individuals marched down the BISD's hallways chanting "Fire Jessie [Haynes] now," responding "lol" to an online comment about Haynes' criminal conviction and involvement in a verbal altercation in a parking lot with two of Haynes' supporters. Haynes adds that that the conspiracy also attacked a book that she wrote.

To aid the panel's understanding of their claims, Appellants' brief includes the chart set forth below, which generally identifies the claims asserted along with the corresponding appellant(s) and appellee(s). Appellants identify six categories of Appellees. "Conspiracy" refers to all of the Appellees collectively. The other five categories of Appellees identified by Appellants are: the Media Appellees, City Councilperson Getz, the IBEW Appellees, the BISD Appellees, and the Prosecutors.

No. 17-40752

| Claim | Appellant(s) | Appellee(s) |
|---|---|---|
| **Defamation** | Walker | |
| Libel | Walker | Media Appellees |
| Slander | Walker | Conspiracy |
| **Tortious Interference** | | |
| With Existing Contract | Walker | Conspiracy |
| With Prospective Contracts | Walker | Conspiracy |
| **Civil Rights Violation** | Walker | BISD Appellees |
| **Civil Conspiracy** (State Law) | Walker | Conspiracy |
| **RICO** | | |
| §1962(c) – racketeering | Walker | BISD Appellees |
| | Haynes | Neil, Crenshaw, Jordan, Reaud, and Getz |
| §1962(a) – use of income from pattern of racketeering | Walker | IBEW Appellees |
| §1962(d) - Conspiracy | Walker and Haynes | Conspiracy |
| **Assault** | Haynes | Neil |

In response to the Fourth Amended Complaint, the Appellees filed multiple motions to dismiss. The IBEW Appellees moved pursuant to Federal Rule of Civil Procedure ("FRCP") 12(c). All other Appellees moved for dismissal under FRCP 12(b)(6) and/or the Texas Citizens Participation Act ("TCPA"). In addition, the BISD Appellees moved for dismissal under FRCP 12(b)(1), and the BISD moved for dismissal of the individual BISD Employees, Board of Managers,[2] and Trustees (collectively the "BISD

---

[2] The Fourth Amended Complaint lists the following defendants as members of the BISD Board of Managers: Venice Monroe, A.B. Bernard, Jimmy Simmons, Robert Turner, Joe Domino, Lenny Cabarello, and Jack Carroll.

No. 17-40752

Agents") under the Texas Tort Claims Act ("TTCA"), TEX. CIV. PRAC. & REM. CODE § 101.106.

With the issuance of eleven written rulings by District Judge Crone (considering nine "Reports and Recommendations" issued by Magistrate Judge Giblin), all claims against all defendants were dismissed on one or more grounds. This appeal followed.

## STANDARD OF REVIEW

Under FRCP 12(b)(1), a party may challenge the subject matter jurisdiction of the court to hear a case.  Sovereign immunity deprives the court of subject matter jurisdiction. *Iraheta v. Linebarger Goggan Blair & Sampson, L.L.P.,* 734 F. App'x 216, 219 (5th Cir. 2018). We review dismissal for lack of subject matter jurisdiction *de novo. Id.*  Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.

FRCP 12(c) permits a party to move for a judgment on the pleadings. "A Rule 12(c) motion may dispose of a case when there are no disputed material facts and the court can render a judgment on the merits based on 'the substance of the pleadings and any judicially noted facts.'" *Linicomn v. Hill,* 902 F.3d 529, 533 (5th Cir. 2018) (quoting *Machete Prods., L.L.C. v. Page,* 809 F.3d 281, 287 (5th Cir. 2015)). A Rule 12(c) motion is subject to the same standard as a motion to dismiss under FRCP 12(b)(6). *Doe v. Myspace, Inc.,* 528 F.3d 413, 418 (5th Cir. 2008).

An appellate court conducts a *de novo* review of a district court's dismissal of a complaint under FRCP 12(b)(6). *See Clyce v. Butler,* 876 F.3d 145, 148 (5th Cir. 2017).  We may affirm a district court's order dismissing a

claim under Rule 12(b)(6) "on any basis supported by the record." *Taylor v. City of Shreveport*, 798 F.3d 276, 279 (5th Cir. 2015)

FRCP 12(b)(6) authorizes the filing of motions to dismiss asserting, as a defense, a plaintiff's "failure to state a claim upon which relief can be granted." *See* FED. R. CIV. P. 12(b)(6). Thus, claims may be dismissed under Rule 12(b)(6) "on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). Dismissal under FRCP 12(b)(6) also is warranted if the complaint does not contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Where the well-pleaded facts of a complaint do not permit a court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—"that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 678 (quoting FED. RULE CIV. P. 8(a)(2)). Accordingly, a complaint's allegations "must make relief plausible, not merely conceivable, when taken as true." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact).").

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Factual allegations that are "merely consistent with a defendant's liability, stop short of the line between possibility and plausibility of entitlement to relief," and thus are inadequate. *Id.* (internal quotations omitted). Accordingly, the requisite facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.* (emphasis added). Even so, however, a "well-pleaded complaint may proceed even if it appears that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. Finally, "[d]etermining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (internal citations omitted). *See also Robbins v. Oklahoma,* 519 F.3d 1242, 1248 (10th Cir. 2008) (degree of required specificity depends on context, i.e., the type of claim at issue).

In evaluating motions to dismiss filed under Rule 12(b)(6), the Court "must accept all well-pleaded facts as true, and . . . view them in the light most favorable to the plaintiff." *Campbell v. Wells Fargo Bank, N.A.,* 781 F.2d 440, 442 (5th. Cir.). Further, "[a]ll questions of fact and any ambiguities in the controlling substantive law must be resolved in the plaintiff's favor." *Lewis v. Fresne*, 252 F.3d 352, 357 (5th Cir. 2001). On the other hand, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see also Iqbal,* 556 U.S. at 678 ("tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557); *see also Christopher v. Harbury*, 536 U.S. 403, 416 (2002) (elements of a plaintiff's claim(s) "must be addressed by allegations in the complaint sufficient to give fair notice to a defendant").

In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to the (1) the facts set forth in the complaint, (2) documents

No. 17-40752

attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201. *See Norris v. Hurst Trust,* 500 F.3d 454, 461, n. 9 (5th Cir. 2007); *R2 Invs. LDC v. Phillips,* 401 F.3d 638, 640, n. 2 (5th Cir. 2005). Judicial notice may be taken of matters of public record. *Firefighters' Retirement Sys., v. Eisneramper*, 898 F.3d 553, 558 n.2 (5th Cir. 2018). When a defendant attaches documents to its motion that are referred to in the complaint and are central to the plaintiff's claims, the court may also properly consider those documents. *Causey v. Sewell Cadillac-Chevrolet, Inc.,* 394 F.3d 285, 288 (5th Cir. 2004); *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 205 (5th Cir. 2007). "In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated." *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 499 (5th Cir. 2000).

## ANALYSIS

In presenting the issues for review on appeal, Appellants generally assert the district court erred in dismissing their claims on pleading grounds and/or defenses asserted by Appellees, including statute of limitations, preemption by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151, *et seq*., and federal and state immunity (prosecutorial, official/absolute, or qualified.) Appellants provide the following summary of their argument:

> This case is about a conspiracy between union members, prosecutors, a school district, and the media to remove African Americans such as Walker and Haynes from positions of power in Beaumont, Texas. After their initial efforts to prosecute Walker for allegedly defrauding [the] BISD through its electrical services contract failed, the Conspiracy ramped up their efforts to tarnish Walker's reputation and destroy his career. When Haynes, a member of [the] BISD's Superintendent's Executive Cabinet,

11

No. 17-40752

supported the Superintendent and stood up for Walker, the Conspiracy turned to her.

The district court erred in dismissing Appellants' claims by demanding more than is required under Rule 12(b) and the TCPA. The court treated Appellees' motions to dismiss as if they had been summary judgment motions but did not give Appellants an opportunity to conduct even limited discovery before deciding they did not have sufficient allegations or evidence to support their claims. In determining the sufficiency of Appellants' allegations, the court pulled statements out of context, and demanded allegations specific to each individual Appellee notwithstanding the rule that co-conspirators are responsible for each other's acts. The court also erred in finding Appellants' claims against the IBEW Defendants preempted under the NLRA, and that the BISD Defendants and Prosecutors are entitled to immunity. The BISD Defendants were not acting within the scope of their employment – particularly Neil when he physically assaulted Haynes. At a minimum, fact issues exist.

## I. **The Texas Citizens Participation Act "TCPA")**

As an initial matter, we note that, until recently, uncertainty existed in this circuit relative to the applicability of the Texas Citizens Participation Act ("TCPA") TEX. CIV. PRAC. & REM. CODE, §§ 27.001-27.011, in federal courts.[3] *See, e.g., Cuba v. Pylant*, 814 F.3d 701, 706 n.6 (5th Cir. 2016) (assuming

---

[3] The TCPA, an anti-SLAPP (Strategic Litigation Against Public Participation) statute, was enacted to "encourage and safeguard the constitutional rights of persons to petition, speak freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM. CODE, § 27.002. To that end, the TCPA creates an expedited process for defendants to quickly obtain dismissal of "retaliatory lawsuits that seek to intimidate or silence them on matters of public concern." *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015).

No. 17-40752

without deciding that the TCPA's (state) procedural rules apply in federal court); *Cuba,* 814 F.3d at 718 (Graves, J., dissenting) (the TCPA conflicts with FRCP 12); *NDCR, L.L.C. v. Mauze & Bagby, P.L.L.C.*, 745 F.3d 742, 746 (5th Cir. 2014) (arguments that TCPA conflicts with FRCP 12(d) and Federal Rule of Appellate Procedure 4 waived because not raised in district court). In this matter, the district court determined that dismissal of Appellants' claims was warranted regardless of whether its analysis was governed by the TCPA or the FRCP.

Recently, however, another panel of this court held: "[b]ecause the TCPA's burden-shifting framework imposes additional requirements beyond those found in [FRCP] 12 and 56 and answers the same question as those rules, the state law cannot apply in federal court." *Klocke v. Watson*, No. 17-11320, 2019 WL 3977545, at *4 (5th Cir. Aug. 23, 2019). Further, '[i]n contrast to the federal procedural requirements, the TCPA imposes additional requirements that demand judicial weighing of evidence." *Id.* "Because the TCPA imposes evidentiary weighing requirements not found in the Federal Rules, and operates largely without pre-decisional discovery, it conflicts with those rules." *Id.*

Within a few days of the issuance of the *Klocke* opinion, we received a letter from counsel, submitted pursuant to Federal Rule of Appellate Procedure 28(j),[4] discussing *Klocke's* potential relevance to the *Examiner*

---

[4] Rule 28 (j) of the Federal Rules of Appellate Procedure provides:

**(j) Citation of Supplemental Authorities.** If pertinent and significant authorities come to a party's attention after the party's brief has been filed--or after oral argument but before decision--a party may promptly advise the circuit clerk by letter, with a copy to all other parties, setting forth the citations. The letter must state the reasons for the supplemental citations, referring either to the page of the brief or to a point argued orally. The body of

Appellees.[5] As part of its discussion, the *Examiner* Appellees reiterate their assertion that Appellants have waived, abandoned, or are estopped from asserting any objection to the application of the TCPA in federal court. Moreover, the *Examiner* Appellees argue, the district court's orders of dismissal should be affirmed under FRCP 12(b)(6).

To date, none of the other parties have submitted a FRAP 28(j) letter regarding *Klocke*. We anticipate, however, that the other Appellees likely agree with the *Examiner* Appellees' position, whereas Appellants will argue that their position is and always has been that they, by conceding their *state* law claims involve statements to which the TCPA applies (except for the assault claim against Appellee Neil), did not concede, waive, or abandon the argument that the TCPA's heightened pleading/evidentiary standard runs afoul of the pleading/discovery/evidentiary requirements of FRCP 8, 12, and 56. [6] We need not resolve this particular dispute, however, because we, like

---

the letter must not exceed 350 words. Any response must be made promptly and must be similarly limited.

*See* FED. R. APP. P. 28 (j).

[5] The letter identifies the "*Examiner* Appellees" as the *Beaumont Examiner*, Don Dodd, Jennifer Johnson, and Wayne Reaud.

[6] The Magistrate Judge's March 11, 2016 Report and Recommendation notes that, during the January 14, 2016 TCPA hearing regarding the motion to dismiss filed by the *Examiner* Appellees, Appellee Jordan, and Appellee Getz, Plaintiffs [Appellants] conceded that their claims involve statements to which the TCPA applies. As of the Magistrate Judge's March 11, 2016 consideration of the *Beaumont Enterprise* Defendants' motion to dismiss, however, Plaintiffs argued that the TCPA cannot be applied to federal claims asserted in federal court. ("All parties agree that the TCPA applies to Walker's claims of defamation, tortious interference, and civil conspiracy, but contest whether it can be applied to his claims of RICO conspiracy.") In response, the *Beaumont Enterprise* Defendants asserted that Plaintiffs are judicially estopped from contesting whether the TCPA can be applied to Plaintiffs' RICO claims and also waived this argument by not addressing it in Plaintiffs' response to the *Beaumont Enterprise* Defendants' motion. Additionally, they argued that because Walker's RICO claims against them are entirely based on defamation, the court could properly dismiss the RICO claims under the TCPA. Finding that Appellants failed to adequately plead their RICO claims under Rule 12(b)(6), the Magistrate Judge concluded the issue need not be addressed.

the district court, find dismissal warranted under the Federal Rules of Civil Procedure, for the reasons stated herein, without consideration of the TCPA.

## II. <u>RICO claims</u>

Walker and Haynes assert RICO violations against various Appellees pursuant to 18 U.S.C. §§ 1962(a), 1962(c), and 1962(d). These claims require Appellants to properly allege a RICO "enterprise" and "pattern" of "racketeering activity."  The district concluded Appellants failed to satisfy these duties.  We agree.

To establish a RICO "enterprise," a plaintiff must provide evidence of the existence of an entity separate and apart from the pattern of racketeering activity. *United States v. Turkette*, 452 U.S. 576, 583 (1981). The entity does not have to be a formal or legal entity, but it must have some sort of hierarchical or consensual decision-making structure, and it must exist for purposes other than just to commit predicate acts. *In re McCann*, 268 F. App'x 359, 366 (5th Cir. 2008); *United States v. Blesdoe*, 674 F.2d 647, 663 (8th Cir. 1982). A plaintiff establishes the existence of an enterprise by providing "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Turkette*, 452 U.S. at 583. For an informal enterprise, known as an association-in-fact enterprise, the "group need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods— by majority vote, consensus, a show of strength, etc." *Boyle v. United States,* 556 U.S. 938, 948 (2009). "Members of the group need not have fixed roles; different members may perform different roles at different times . . . ." *Id.* Further, "while the proof used to establish these separate elements may in

particular cases coalesce, proof of one does not necessarily establish the other. The 'enterprise' is not the 'pattern of racketeering activity.'" *Id.* Plaintiffs must "plead specific facts, not mere conclusory allegations which establish the enterprise." *Manax v. McNamara*, 842 F.2d 808, 811 (5th Cir. 1988). Finally, "a RICO plaintiff must plead the specified facts as to each defendant. It cannot . . . 'lump[ ] together the defendants.'" *In re MasterCard Int'l, Inc., Internet Gambling Litig.*, 132 F. Supp. 2d 468, 476 (E.D. La. 2001), *aff'd*, 313 F.3d 257 (5th Cir. 2002) (quoting *Goren v. New Vision Int'l, Inc.,* 156 F.3d 721, 730 (7th Cir. 1998)).

As discussed by the district court, Appellants' pleading of an enterprise in the Fourth Amended Complaint is wholly conclusory and unsupported by facts. Walker asserts that all Appellees shared some connection with him, were similarly critical of his dealings with the BISD, and/or have sought or supported the imposition of criminal and/or civil penalties against him relating to his dealings with the BISD.  Nevertheless, assuming all of that to be true, the facts alleged are insufficient to render plausible Walker's attempted characterization of the various unrelated Appellees as an "ongoing organization, formal or informal, that functions as a continuing unit."  The same is true of the conspiracy allegations relative to a knowing agreement to commit at least two predicate acts in furtherance of a substantive RICO offense.

Turning to the element of "racketeering activity," neither defamation, intentional interference, nor online harassment qualifies as a RICO predicate act.  *See* 18 U.S.C. § 1961(1). Absent a taking of property sufficient to establish extortion for purposes of § 1961(1), the same is true of the IBEW members' alleged threatening of Walker when he refused to join the union. And although Haynes contends that she suffered state prosecution in

retaliation for seeking redress for Neil's alleged physical assault her (when he forced her away from a doorway), witness tampering and witness retaliation for purposes of § 1961(1), § 1512, § 1513, and § 1515(a)(1) involve only federal proceedings and offenses.   Finally, although the district court concluded Walker had properly alleged four predicate acts (witness tampering and retaliation by the FBI and FBI agent Stevens against her ex-husband, Luke Stevens, and witness tampering and bribery by FBI agents Stevens and Brewer), the district court also aptly concluded the acts presented no threat of continuing criminal activity because all four acts occurred during a limited period of time and solely by certain federal officers in relation to Walker's criminal trial.

## III. Law Enforcement Appellees

Prosecutors enjoy absolute immunity for conduct "intimately associated with the judicial phase of the criminal process." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342–43 (2009) (citing *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). Prosecutorial immunity is based upon the concern that "harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Imbler*, 424 U.S. at 422; *Culbertson v. Lykos*, 790 F.3d 608, 627 (5th Cir. 2015) ("This immunity arises from the public interest in shielding prosecutors from liability so they may exercise independent judgment when deciding which suits to bring and how to present them in court."); *Cousin v. Small*, 325 F.3d 627, 635-36 (5th Cir. 2003) (citations omitted). A prosecutor remains entitled to absolute immunity even if he or she acted "maliciously, wantonly[,] or negligently." *Rykers v. Alford*, 832 F.2d 895, 897 (5th Cir. 1987) (quoting *Morrison v. City of Baton Rouge*, 761 F.2d 242, 248 (5th Cir. 1985)).

No. 17-40752

Actions to which prosecutorial immunity applies include professional evaluation of the evidence, initiation of prosecution, interviewing witnesses in preparation for trial, and other actions taken throughout the judicial process. *Buckley v. Fitzsimmons*, 509 U.S. 259, 272-73 (1993); *Brown v. Dove*, 519 F. App'x 237, 238 (5th Cir. 2013); *Hoog-Watson v. Guadalupe Cty., Tex.*, 591 F.3d 431, 438 (5th Cir. 2009) (citations omitted).  This immunity does not apply when a prosecutor is engaged in investigative or administrative tasks. *Van de Kamp*, 555 U.S. at 342; *Culbertson*, 790 F.3d at 627; *Hoog-Watson*, 591 F.3d at 438 ("In other words, prosecutorial immunity protects 'the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial,' but not 'the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested.'") (quoting *Buckley*, 509 U.S. at 273).

Addressing each of the pertinent allegations outlined in the Fourth Amended Complaint, the district court concluded that all of Appellants' allegations against government attorneys Bales, Rawls, and Crenshaw arose solely from their acts as prosecutors and officers of the court. On the record before us, we find no error in that determination.

Although the immunity status of the FBI agents (Stevens and Brewer) differs from the prosecutors given the agents' investigatory rather than prosecutorial roles, qualified immunity principles shield both federal and state law enforcement personnel. Once a defendant raises qualified immunity, the court evaluates the objective legal reasonableness of the defendant's conduct in light of legal rules clearly established as of the time of the defendant's action. *Ziglar v. Abbasi,* 137 S. Ct. 1843, 1866, 198 L. Ed. 2d 290 (2017).  Appellants' claims relative to Stevens and Brewer, however, are RICO claims as to which we have affirmed the district court's dismissal.

18

No. 17-40752

Accordingly, further discussion of qualified immunity principles relative to them is unnecessary.

## IV. **IBEW Appellees**

At oral argument, Appellants' counsel identified *Windfield v. Groen Div. Dover Corp.,* 890 F.2d 764, 766-68 (5th Cir. 1989) as Appellants' "best preemption case." In *Windfield*, we addressed the National Labor Relations Act's ("NLRA") federal preemption of state law claims as articulated by the Supreme Court in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 244 (1959). Specifically, "*Garmon* recognized that in enacting federal labor legislation through the NLRA, 'Congress did not exhaust the full sweep of legislative power . . .'" *Id.* at 767 (internal citations omitted). "Nevertheless, the NLRA was enacted because 'Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules. . . .'" *Id.* (quoting *Garmon*, 359 U.S. at 242–43). Hence, *Garmon* announced a general rule of preemption:

> [w]hen it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield."

*Windfield,* 890 F.2d at 767 (quoting *Garmon,* 359 U.S. at 244).

Several significant exceptions to *Garmon* exist. *Id.* When the issue under state law is arguably prohibited by the NLRA, the Court has refined the analytical framework:

> "[t]he critical inquiry, therefore, is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is identical to

No. 17-40752

(as in *Garner* [*v. Teamsters,* 346 U.S. 485 (1953)]) or different from (as in *Farmer* [v. *v. United Brotherhood of Carpenters,* 430 U.S. 290 (1977)]) that which could have been, but was not, presented to the Labor Board. For it is only in the former situation that a state court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the *Garmon* doctrine was designed to avoid.

*Windfield,* 890 F.2d at 767. Here, the district court, reviewing Appellants' objections to the Magistrate Judge's Report and Recommendation reasoned:

Plaintiffs do not contest the determination that Walker's claims against the IBEW allege conduct that is arguably prohibited by the NLRA. Instead, they argue that Judge Giblin erred in finding that Walker's claims against the IBEW should be dismissed for the same reasons articulated in *Jones*. *See Local 926, Int'l Union of Operating Eng'rs, AFL-CIO v. Jones*, 460 U.S. 669, 682 (1983). They aver that Walker's case is more analogous to *Belknap* [*v. Hale*, 463 U.S. 491 (1983)], wherein the Supreme Court found that claims of breach of contract and misrepresentation against an employer brought by replacement workers, hired to replace a number of union members who went on strike, did not fall under either *Garmon* preemption or *Machinists* preemption. *See [Belknap,]* 463 U.S. at 498; *see also Machinists v. Wis. Emp't Relations Comm'n*, 427 U.S.132, 140 (1976). Regarding *Garmon* preemption, the Supreme Court determined that the dispute at issue was between the replacement workers and their employer and, thus, did not present an identical controversy to the one that would be before the NLRB, which would be between the striking union workers and the employer, and thus *Garmon* preemption did not apply. []

In contrast to the *Belknap* and *Windfield* decisions, however, both of which were addressed in

20

No. 17-40752

the report and recommendation, the heart of Walker's complaint against the IBEW is a labor dispute. He asserts that the entire, decades-long conspiracy to ruin his reputation and business stems from the IBEW's attempt to force him to join the union; when he refused, the IBEW allegedly masterminded an elaborate conspiracy in retaliation. Accordingly, the court agrees that *Jones*, which held that an employee's claims of tortious interference and civil conspiracy were *Garmon* preempted where the employee alleged that the union coerced his employer into breaching his employment contract, is more applicable to Walker's case, and, thus, his claims are preempted for the reasons laid out therein. [*Jones*], 460 U.S. at 682 [].

Furthermore, the court rejects Walker's contention that it should assert jurisdiction over Walker's claims because some of the IBEW's purported conduct after its initial attempt to coerce Walker into joining the union "goes far beyond a union-member relationship and outside a 'labor dispute.'" In making this argument, Walker asks the court to distinguish between conduct purportedly undertaken to coerce Walker into joining the union and conduct allegedly undertaken purely in retaliation for his refusal. As was addressed in Judge Giblin's report and recommendation, a nearly identical argument was rejected by the Supreme Court in *Jones*. 460 U.S. at 682. Therefore, Walker's objection is overruled.

We find no error in the lower court's careful analysis. The NLRB undoubtedly has a strong interest in addressing alleged coercive "recruiting" and retaliatory measures undertaken by and in the name of labor unions

21

seeking to increase union membership and market power. Accordingly, we affirm the district court's dismissal of the IBEW Appellees.[7]

## V. Statute of Limitations

Walker asserts defamation claims, as well as other tort claims based on the alleged defamation. Before delving into the merits, we first address the timeliness of those claims premised upon pre-July 26, 2014 conduct.

Under Texas law, defamation claims generally are subject to a one-year statute of limitations. TEX. CIV. PRAC. & REM. CODE, §§ 16.002(a), 16.003(a); *Jackson v. W. Telemarketing Corp.*, 245 F. 3d 518, 523 (5th Cir. 2001). The one-year limitation likewise applies to other causes of actions for which the gravamen of the complaint is injury to a plaintiff's reputation because of allegedly defamatory statements. *Hamad v. Center for Jewish Cmty. Studies,* 256 F. App'x 414, 417 (5th Cir. 2008) (citing *Holloway v. Butler*, 662 S.W.2d 688, 692 (Tex. App. 1983, writ ref'd n.r.e.)). Whether the statute of limitations has expired depends on when the claims accrued. *See, e.g.*, *Velocity Databank, Inc. v. Shell Offshore, Inc.*, 456 S.W.3d 605 (Tex. App. 2014, pet. denied). Typically, a defamation claim accrues when the matter is published. For traditional printed statements, Texas adopted the "single-publication rule," i.e., that defamation claims may be brought within the first year from the first date of publication. *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 173 (Tex. 2003); *Holloway,* 662 S.W.2d at 692 (concluding "publication is complete on the last day of the mass distribution of copies of the *printed* matter") (emphasis added).

---

[7] Paragraphs 31-37 of the Fourth Amended Complaint list the following persons as IBEW Defendants (in addition to the International Brotherhood of Electrical Workers): the IBEW Local Union 479, Steven Lisle, Dwayne or Duwayne Hermann, Chris Kibby, David Gonzales, and Wayne Reaud.

No. 17-40752

When we heard oral argument in this matter, the Texas Supreme Court had not yet decided whether to extend this rule to internet publications. In those circumstances, federal courts "must make an *Erie* guess and determine . . . how that court would resolve the issue if presented with the same case." *City of Alexandria v. Brown*, 740 F.3d 339, 351 (5th Cir. 2014) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d at 206)) (internal quotations omitted). In 2007, in *Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, 512 F.3d 137, 141–46 (5th Cir. 2007), we, considering cases from other jurisdictions and Texas public policy interests, predicted that the Texas Supreme Court would extend the single publication rule to internet publications.[8] Thus, we rejected Nationwide's assertion that internet publications are subject to the continuous publication rule, such that "each time a viewer accesses the article from the website a 'republication' occurs for statute of limitations purposes," rather than single publication rule.

Since oral argument in this matter, however, the Texas Supreme Court, in *Glassdoor, Inc. v. Andra Group, LP*, 575 S.W.3d 523, 529 (Tex. 2019) confirmed the accuracy of the *Nationwide* prediction by adopting "a single publication rule [for] information made publicly available on the internet." Under a single publication standard, the (allegedly defamatory) statements and articles on which Walker's claims are premised that were published more than one year prior to the July 16, 2015 filing date of his original complaint are time-barred. *See, e.g. Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003) ("A statute of limitations may support dismissal under Rule 12(b)(6) where it

---

[8] In making an *Erie* guess, federal courts should "defer to intermediate state appellate court decisions, unless convinced by other persuasive data that the highest court of the state would decide otherwise." *City of Alexandria*, 740 F.3d at 351 (quoting *Mem'l Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GMBH,* 524 F.3d 676, 678 (5th Cir. 2008)) (internal quotations omitted).

is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like.").

Nevertheless seeking to avoid dismissal on grounds of timeliness, Walker emphasizes that courts have long considered amendments to and re-publication of defamatory material to be a new "publication."[9]  On this basis, he contends the district court erred in dismissing his claims at the pleading stage of the proceeding without giving him an opportunity to conduct discovery to determine if the pre-July 16, 2014 statements had been "re-published, re-stated, edited, retracted, or modified since the original publications, or if the statements meet any other exception to the statute," as discussed in *Mayfield v. Fullhart*, 444 S.W.3d 222 (Tex. App. 2014, pet. denied).

In the district court, however, Appellants did not plead possible re-publication of statements that, as alleged, are untimely on the face of the Fourth Amended Complaint  Nor did Appellants oppose Appellees' motion seeking an expedited hearing under the TCPA, § 27.006, or *The Examiner* Appellees' motion to stay discovery in the case.[10]  Indeed, it is not apparent that Walker, at any time between the July 2015 filing of the original complaint and the district court's 2016 and 2017 orders granting dismissal, ever sought discovery regarding possible re-publication – either by leave of

---

[9] *See, e.g.*, *Nationwide*, 512 F.3d at 146; *In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 174 (3d Cir. 2012) (an exception to the single publication rule is republication; republishing, editing and reissuing, or placing material in a new form that includes the defamatory material resets the statute of limitations.).

[10] "A court's decision to limit discovery is reviewed for abuse of discretion." *Crosby v. Louisiana Health Serv. & Indem.* Co., 647 F.3d 258, 261 (5th Cir. 2011).  Although a court is afforded broad discretion when deciding discovery matters, the court abuses its discretion when its decision is based on an erroneous view of the law. *Id.*  The district court concluded the Magistrate Judge stayed discovery under a federal trial court's inherent power to stay discovery and the FRCP, not the TCPA

court or by agreement of the parties. Accordingly, as determined by the district court, this argument fails to resuscitate claims premised on allegedly defamatory statements made prior to July 16, 2014. [11]

## VI.    Defamation

Relative to Appellants' *timely* filed defamation claims, Texas law establishes the following elements to state an actionable claim of defamation: (1) publication of a false statement of fact to a third party, (2) the statement must concern the plaintiff and be defamatory, (3) the publication must be made with the requisite degree of fault, and (4) the publication must cause damages. *Lipsky*, 460 S.W.3d at 593. A statement is defamatory "if it tends to injure a person's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation." *Lipsky*, 460 S.W.3d at 593 (citing *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998)). Damages must be shown unless the statements are defamatory *per se* such that damages are presumed. Defamation *per se* refers to statements that are so obviously harmful that general damages may be presumed. *Id.*

In a defamation suit against a media defendant over a matter of public concern, the plaintiff bears the burden of proving falsity. *Neely v. Wilson*, 418 S.W.3d 52, 62 (Tex. 2013) (citing *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 777 (1986)); *McIlvain v. Jacobs,* 794 S.W.2d 14, 15 (Tex. 1990). In determining whether a statement is false, Texas has adopted the substantial-truth doctrine, under which a plaintiff is precluded from recovery when a

---

[11] These claims include all those asserted against the *The Examiner* Appellees and those asserted against journalist Jerry Jordan.

"publication . . . correctly conveys a story's 'gist' or 'sting' although erring in the details." *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 115 (Tex. 2000).

This evaluation involves looking at the "gist," or meaning, of a broadcast [or article], which is determined "by examining how a person of ordinary intelligence would view it." *Neely*, 418 S.W.3d at 63-64, 66-67. Thus, the court must determine "if a broadcast taken as a whole is more damaging to the plaintiff's reputation than a truthful broadcast would have been,*"* in the mind of the average person. *Id.* at 63 (*citing Turner*, 38 S.W.3d at 115); *accord McIlvain,* 794 S.W.2d at 16; *see AOL, Inc. v. Malouf,* No. 05-13-01637-CV, 2015 WL 1535669, at *4 (Tex. App. Apr. 2, 2015, no pet.) (mem. op.) (holding news article was not substantially false even though it stated that plaintiff had been charged with criminal Medicaid fraud when the charges were civil and despite the article using the words "charged" and "stolen"); *Basic Capital Mgmt., Inc. v. Dow Jones & Co.*, 96 S.W.3d 475, 481-82 (Tex. App. 2002, no pet.) (newspaper article stating that investment firm had been involved in money laundering was substantially true when only two employees had been charged with fraud and conspiracy, not money laundering, and company was only mentioned in indictment, but not charged).

Regarding the element of fault, the status of the person alleging defamation determines the requisite degree of fault. A private individual need only prove negligence, whereas a public figure or official must prove actual malice. *Lipsky*, 460 S.W.3d at 593. Here, as noted by the district court in its February 11, 2016 Memorandum Order, Appellants have conceded that they are limited-purpose public figures. Accordingly, Walker must have sufficiently alleged actual malice in order to state a defamation claim.

"'Actual malice' in this context does not mean bad motive or ill will." *Greer v. Abraham*, 489 S.W.3d 440, 444 (Tex. 2016). Rather, it means that

the statement was made with knowledge of its falsity or with reckless disregard for its truth. *Huckabee v. Time Warner Entm't Co.,* 19 S.W.3d 413, 420 (Tex. 2000). "Thus, the constitutional focus is on the defendant's attitude toward the truth, not his attitude toward the plaintiff." *Greer*, 489 S.W.3d at 444.

To establish reckless disregard, the publisher must have "'entertained serious doubts as to the truth of his publication.'" *Huckabee,* 19 S.W.3d at 420 (quoting *St. Amant v. Thompson,* 390 U.S. 727, 731 (1968)). Neither a failure to investigate fully nor an understandable misinterpretation of ambiguous facts constitutes actual malice. *Schofield v. Gerda*, No. 02-15-00326-CV, 2017 WL 2180708, at *19-20 (Tex. App. May 18, 2017); *see also Weber v. Fernandez,* No. 02-18-00275-CV, 2019 WL 1395796, at *18 (Tex. App. Mar. 28, 2019) (failure to investigate is not evidence of actual malice unless publisher purposefully avoided the truth).

On this point, the district court concluded, with regard to the *Examiner* Appellees, Jordan, and Getz, that Walker had failed to allege clear and specific evidence of actual malice – a required element for public figure plaintiffs – such that his defamation claims were dismissed for that reason, "without regard to the outcome of the limitations and substantial-truth issues." Although this ruling refers to the "clear and specific" evidence standard imposed by the TCPA, Walker's allegations regarding actual malice likewise fail when considered under the Federal Rules of Civil Procedure. *See Taylor v. City of Shreveport*, 798 F.3d 276, 288 (5th Cir. 2015) ("we may affirm an order granting a motion to dismiss 'on any basis supported by the record'")(quoting *Asadi v. G.E. Energy (USA), L.L.C.,* 720 F.3d 620, 622 (5th Cir. 2013)).

No. 17-40752

Specifically, the Fourth Amended Complaint alleges only that the "members of the Conspiracy making [defamatory] statements acted with actual malice, knowledge, negligence and/or recklessness as to the truth of those statements" and that "Walker repeatedly and timely asked the members of the Conspiracy making defamatory statements to cease and desist from making such false statements [but they] failed to retract, correct, or clarify the statements." Appellants' brief is similarly deficient, adding only that "[t]he Conspiracy was fully aware of the falsity of their statements but continued making them . . . ." Such scant assertions are insufficient to allow the court to infer more than the mere possibility of misconduct. Significantly, Walker has not alleged, for example, relative to *any* of the Appellees, the existence or contents of specific discussions, correspondence, or supporting documentation provided to any of the media defendants – either prior to or shortly after the publications in questions – purporting to correct any errors or misstatements in the publications. On this very limited showing, we agree with the district court that the deficiency of Appellants' "actual malice" allegations provides an independent, standalone basis for dismissal of Walker's defamation claims.

Texas law recognizes a "fair reporting privilege" as a defense to defamation. As codified in § 73.002(a)–(b), "[t]he publication by a newspaper or other periodical material . . . is privileged" when that newspaper presents "a fair, true, and impartial account" of a judicial proceeding, an official proceeding to administer the law, or other public proceeding, including a proceeding before "a managing board of an educational . . . institution [or] . . . of a public school board." *See* TEX. CIV. PRAC. & REM. CODE, § 73.002(a)-(b); *see also Dallas Morning News, Inc. v. Hall,* No. 17-0637, 2019 WL 2063576, at \*8 (Tex. May 10, 2019), reh'g denied (Aug. 30, 2019)) (media outlets enjoy a

No. 17-40752

privilege that protects publications describing official proceedings of public concern). [12]

This privilege extends to information a newspaper receives from a press release issued by law enforcement or a governmental agency. *Freedom Commc'ns, Inc. v. Sotelo*, No. 11-050336-CV, 2006 WL 16644602, at *4 (Tex. App. June 15, 2006, no pet.) (mem. op.). The privilege, however, "does not extend to the republication of a matter if it is proved that the matter was republished with actual malice after it had ceased to be of public concern." TEX. CIV. PRAC. & REM. CODE, § 73.002(a).

Given that the fair reporting privilege is a defense, the defendant has the burden of proving the applicability of the privilege, i.e., that the defendant is part of media and the statements were an account of official proceedings of public concern. *KBMT Operating Co., LLC v. Toledo*, 492 S.W.3d 710, 715 (Tex. 2016). "A private individual suing a media defendant for defamation over a report on official proceedings of public concern, however, has the burden of proving that the gist of the report was not substantially true—that is, that the report was not a fair, true, and impartial account of the proceedings." *Id. K* "That burden is not met with proof that the report was not a substantially true account of the actual facts outside the proceedings." *Id.* Rather, "[w]hen the privilege applies, the gist of an allegedly defamatory broadcast must be compared to a truthful report of the official proceedings, not to the actual facts."

---

[12] This statute, §73.002(a)-(b), enacted in 1901, codifies the common-law privilege the media have to report on judicial proceedings without regard for whether the information from such proceedings is actually true. *KBMT Operating Co., LLC v. Toledo*, 492 S.W.3d 710, 713 (Tex. 2016).

29

To determine whether a publication is protected by the fair reporting privilege, a court must interpret the account "in the sense that the ordinary reader would understand." *Tex. Monthly, Inc. v. Transamerican Nat'l Gas Corp.*, 7 S.W.3d 801, 805 (Tex. App. 1999, no pet.)(citing *Crites v. Mullins*, 697 S.W.2d 715, 717 (Tex. App. 1985, writ ref'd n.r.e.)). "The critical test is the effect on the mind of the reader or listener; if the effect on the mind of the recipient would be the same, any variance between the actions charged and the actions proved should be disregarded."). *Finklea v. Jacksonville Daily Progress*, 742 S.W.2d 512, 515 (Tex. App. 1987), writ dismissed w.o.j. (Mar. 30, 1988) (citations omitted). Even greatly exaggerated accounts are substantially true "if no more opprobrium would be attached to the [plaintiff's] actions merely because of such exaggeration." *Id.* A court may determine privilege as a matter of law "[w]here the facts are undisputed and the language used in the publication is not ambiguous." *Klentzman v. Brady,* 456 S.W.3d 239, 252-53 (Tex. App. 2014), *aff'd,* 515 S.W.3d 878 (Tex. 2017).

In this case, the *Beaumont* Enterprise Appellees (The Hearst Corporation d/b/a The *Beaumont Enterprise* and writer Brooke Crum) assert that all of the news articles at issue are privileged accounts of the following four government proceedings and records: (1) a July 17, 2012 press release from the United States Attorney's Office stating that (a) Walker had willfully failed to report approximately $1.5 million in income to the federal government, (b) a bid altered to look like an invoice for labor in the amount of $382,975.32 had been submitted to the BISD, and (c) Walker had agreed to forfeit $3.2 million, out of which the BISD could seek restitution;  (2) a July 17, 2012  letter from the United States Attorney's Office to the BISD) informing the BISD that Walker would be forfeiting $3.2 million and that the BISD could potentially seek restitution for at least $1.8 million that it had

overpaid Walker; (3) the July 17, 2012 factual basis and stipulation attached to Walker's plea agreement , in which he agreed that bid documents altered to look like invoices were submitted to the BISD; and (4) the August 28, 2012 finding by the Texas Comptroller that Walker's admissions in his plea agreement "constitute[d] sufficient admitted evidence of fraudulent behavior in a procurement setting" to support its decision to debar Walker from working for the State of Texas for five years. The *Beaumont Enterprise* Appellees also assert that Walker cannot prevail on his defamation claims against them because he has failed to provide evidence of the falsity of any of the allegedly defamatory articles. [13]

Regarding the issue of falsity (as an element of Walker's claim) and the "fair reporting" privilege, the main focus of Walker's defamation claims against the *Beaumont Enterprise* Appellees concerns their articles reporting that, as part of his guilty plea to willful failure to pay income taxes, he had admitted to falsifying invoices for which the BISD had paid, that he had agreed to repay the BISD for the money that he had stolen, and/or that "in exchange for" his pleading guilty to a federal tax violation, "he had agreed to forfeit $3.2 million and to acknowledge he altered electrical invoices presented to the school district." Walker asserts that, although the records of the BISD contained altered documents, there was no evidence admitted at trial that Walker or his wife submitted those documents to the BISD in connection with receiving payments for projects. Rather, as set forth in Appellants' brief, he explains:

---

[13] Given  the 2012 and 2013 publication dates of the articles attached to the Fourth Amended Complaint, occurring well before July 2014 (one-year prior to the July 2015 filing date of this action),  it unnecessary for this panel to discuss the merits of the defamation claims asserted against any media defendant other than the *Beaumont Enterprise* Appellees.

Nowhere does Walker admit to *submitting* altered documents to [the] BISD, seeking payment from [the] BISD based on such documents, receiving money from [the] BISD on the basis of altered documents, or unlawfully appropriating property of [the] BISD. Even [the] BISD agreed Walker did not unlawfully appropriate property of or defraud [the] BISD after conducting its own internal audit, being under months of pressure and scrutiny created by the Conspiracy to terminate its contract with Walker, and having employees actually testify at Walker's criminal trial. Former superintendent Dr. Carroll Thomas drafted a glowing letter of recommendation for Walker. Though [the] BISD did not agree it was a victim, the perpetrator steadfastly denied fraud, and the government was never able to prove it, the Conspiracy created a fictitious tale of fraud.

The declaration of [Mr. DeGuerin, Walker's criminal defense attorney] and testimony from Walker's trial further support Walker's position that he did not submit altered invoices to the BISD, and did not expect, demand payment, or receive payment based on the invoices. DeGuerin explained, "[T]he plea agreement does not say that Mr. Walker submitted altered documents to [the] BISD. [...] Walker steadfastly denied submitting any false documents to [the] BISD." The evidence introduced at trial concerning the "altered invoices" was that Ms. Walker mistakenly sent them to [the] BISD instead of her tax accountant. DeGuerin explained how Walker used uncashed checks as an accounting method, and his wife mistakenly sent the documents to [the] BISD. As soon as Walker realized the documents had been sent to [the] BISD, he went to [the] BISD to retrieve them. "Neither Mr. Walker nor his wife submitted the documents in connection with requesting or receiving payments for the project; Mr. Walker did not intend to defraud or deceive [the] BISD, [the] BISD was not defrauded or deceived, and Mr. Walker completed his

No. 17-40752

work to the satisfaction of [the] BISD." Nothing in the plea agreement or related documentation supports Appellees' defamatory statements. The statements are not privileged as fair reports of official documents or as substantially true.

Relative to these contentions, Walker's factual basis, in addition to describing his failure to pay certain income taxes for the 2009 tax year, states in pertinent part:

> Records of the [the] BISD contained copies of bills of materials from third party electrical wholesale companies along with copies of unnegotiated checks drawn on defendant's bank account in the same amounts, payable to said wholesalers. Included in the wholesale invoice was an invoice in the amount of $382,975.32 which had been altered to reflect it was an invoice when in fact the document was a quote and not an actual purchase. The defendant's check to that wholesaler in the amount of $383,975.32 was never presented to the wholesaler or negotiated. Records of the BISD also contained similar altered documents purportedly from the same electrical supplier matching invoices submitted by the defendant for materials in other projects.

The Magistrate Judge found that Walker failed to specifically address the fair reporting privilege set forth in § 73.002. Nor did he address any of the governmental documents provided to the court by the *Beaumont Enterprise* Appellants, aside from the factual basis and stipulation attached to his plea agreement. Instead, the Magistrate Judge concluded, Walker simply argued generally that the articles are not substantially true or fair, or, at the very least, are ambiguous in meaning.

Examining each of those governmental documents and the articles that Walker attacks, the Magistrate Judge summarized Walker's position as

33

arguing generally that the first three articles are false and misleading for two reasons: (1) the monetary amounts listed for Walker's forfeiture agreement and the BISD's possible forfeiture claims are too high and (2) the articles imply that Walker admitted to defrauding the BISD in his plea agreement.[14] As to the first issue, the Magistrate Judge concluded that the effect of the *Beaumont Enterprise* Appellees' articles on the mind of the ordinary reader would not be altered even if the *Beaumont Enterprise* Appellees exaggerated the monetary amounts at issue.

As to the second, Walker, as noted by the Magistrate Judge, contends that the *Beaumont Enterprise* Appellees' first three articles are defamatory because they state that Walker admitted to falsifying invoices in his plea agreement and factual stipulation, which implies that Walker defrauded the BISD.  The Magistrate Judge concluded:

> Comparing the *Enterprise* Defendants' articles to the listed government documents, particularly Walker's plea agreement, it becomes clear that the differences in wording are minor and merely semantic. In Walker's plea agreement, he admitted that multiple bid quotes were submitted to [the] BISD that had been altered to look like invoices, one such "invoice" was accompanied

---

[14] As described by the Magistrate Judge in the March 11, 2016 Report and Recommendation, the first *Beaumont Enterprise* article, dated October 19, 2012, is titled "BISD will not seek Calvin Walker restitution." Walker asserts that this article is defamatory because, by announcing that BISD could seek $2 million in restitution, it misleads readers into believing that Walker had defrauded BISD by that amount.  The second *Beaumont Enterprise* article, dated March 11, 2014, is titled "TEA report questions BISD's employment of Calvin Walker." Walker contends that it is defamatory because it states: "In his plea agreement, Walker signed a statement that he knowingly altered invoices that were submitted to the school district for repayment in the amount of $2 million. He forfeited a total of $3.5 million in his plea agreement, $2 million of which the school district could have sought." Third, Walker identifies an article published by Crum on July 28, 2014, titled "BISD will rebid contract given to Calvin Walker." Walker argues the article is defamatory because it states that he admitted in his plea agreement to "falsifying" invoices submitted to BISD, thus implying that he had defrauded the BISD.

by a check payable to a wholesaler for the same amount that was never presented to that wholesaler or negotiated, and the "invoice" came from Walker's company. An ordinary reader would not discern a difference in meaning between Walker's plea agreement and the *Enterprise* Defendants' accounts after comparing Walker's plea agreement, the various government documents provided by the *Enterprise* Defendants in their motion to dismiss, and these three articles. Therefore, these three articles are privileged under Texas law.

Continuing to a fourth article, dated July 30, 2014 and titled "Grand jury indicts BISD electrician for fraud," Walker contends the article is defamatory because it suggests that the only reason that the BISD would not recover $343,000 from Walker was because it refused to say it was a crime victim. The Magistrate Judge, questioning first whether an article reporting the BISD's insistence that it had *not* been defrauded is defamatory, concluded the article was privileged, reasoning that, as a whole, it presented a true, fair, and accurate account of Walker's indictments in state court, previous criminal proceedings, and related government documents. The Magistrate Judge reached the same conclusions regarding a fifth article published on October 2, 2014, titled "U.S. Attorney: BISD restitution money is gone," and a sixth article, published on October 15, 2014 article, titled "BISD board ditches electrician."

Reviewing Walker's objections to the Magistrate Judge's report and recommendations, the District Judge found the Magistrate Judge's lengthy assessment thorough, well-reasoned, and supported by the record. We agree. Although someone trained in the law, carefully parsing through the various articles, and government/official documents to which they were compared, might take issue with the literal truth of certain of the statements, the legal authorities cited above clearly establish that literal truth is *not* the

35

applicable standard. Rather, it is the ordinary person's assessment that is determinative, not Walker's preferred account of events.[15] Accordingly, as the district court aptly concluded, Walker's timely filed defamation claims, asserted against the *Beaumont Enterprise* Appellees fail on the elements of actual malice and falsity, and when considered against the fair reporting defense.

## VII. **Tortious Interference Claims**

### A. Tortious Interference with Existing Contract

To prove tortious interference with an existing contract, Walker must show (1) he had a valid contract, (2) the defendants willfully and intentionally interfered with the contract, (3) the interference proximately caused Walker's injuries, and (4) he incurred actual damage or loss. *Butnaru v. Ford Motor Co.*, 84 S.W. 3d 198, 207 (Tex. 2002). In response to a motion to dismiss under the TCPA, Walker must "present evidence that some obligatory provision of a contract has been breached." *Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 361 (Tex. App. 2013, pet. denied) (quoting *Funes v. Villatoro*, 352 S.W.3d 200, 213 (Tex. App. 2011, pet. denied).

---

[15] Although Appellants' brief characterizes Walker's wife's trial testimony, as well as his lawyer's subsequent declaration, as explaining that Walker used the "uncashed checks [made payable to third-party suppliers] as an accounting method," no logical explanation of the purported accounting procedure has been identified in the record. Similarly, despite Walker's assertion that neither he nor his wife ever "submitted the documents in connection with requesting or receiving payment for the project," and that he "did not intend to defraud or deceive [the] BISD," the factual basis executed in connection with his plea agreement expressly references "[r]ecords of the BISD contain[ing] . . . an invoice . . . altered to reflect that it was an invoice when in fact the document was a quote and not an actual purchase" and then states "[r]ecords of the BISD also contained similar altered documents purportedly from the same electrical supplier matching invoices submitted by the defendant for materials in other projects."

To the extent that Walker complains about the adverse inferences reasonably drawn from the language in his factual basis, perhaps he should have insisted that additional clarifying language be included prior to adopting it in connection with his guilty plea.

In support of this claim, Walker alleges "the Conspiracy, including the Media Defendants, Getz, BISD Trustees, and Prosecutors, harassed BISD for its decision to continue working with Walker and refuse to demand restitution from Walker." Additionally, "BISD Trustees regularly requested documents related to African-American employees and vendors of [the] BISD from the Office of the Superintendent, and then gave them to Media Defendants for publication with inflammatory headlines – at the direction of Reaud." Walker contends: "Such publications disrupted   [the] BISD's operations and were intended to interfere with Walker's contract with BISD." He adds: "Neil was quoted in July of 2014 saying he would seek to have Walker's contract cancelled.". Further, "Rawls sent [the] BISD a memorandum essentially demanding [that the] BISD not release the sums owed to Walker and terminate his maintenance contract."

Thereafter, in 2014,Walker alleges, the "BISD Board of Managers did not renew and improperly terminated the contract, without notice, and awarded it to a white union electrical contractor." Further, the BISD supported its decision on scores derived from an Evaluation Matrix prepared by BISD (Employee) Appellees Saleme, Covington, and Butler, which falsely stated "District's Previous Provider Admitted guilt to padding BISD invoices. Paid back over $2,000,000." Walker contends these actions, alone and in agreement with others in the conspiracy, were a proximate cause of actual damages to him.

Although Walker asserts this claim and provides the foregoing assertions, he does not identify an actual breach of the contract. Rather, his actual complaint appears to be that his contract was not renewed at the end

No. 17-40752

of its term.   Merely alleging nonrenewal, however, does not equate to an actionable breach of contract.[16]

### B. Tortious Interference with Prospective Contract

Under Texas law, "[t]o prevail on a claim for tortious interference with prospective business relations, a plaintiff must establish that (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result. *See Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909 (Tex.2013) ((*citing Wal–Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 726 (Tex.2001) (addressing requirement of predicate tort or unlawful conduct)). Establishing that defendant's conduct was independently tortious or wrongful does not require that the plaintiff be able to prove an independent tort. *See Wal–Mart Stores, Inc,* 52 S.W.3d at 726. Rather, proof that the defendant's conduct would be actionable (as to someone) under a recognized tort is sufficient.

Walker's brief confirms that he asserts this claim against all members of the Conspiracy *except* the BISD.  He contends the same facts relevant to

---

[16]   Relative to any other state-law tort claims asserted against the BISD, Appellants have not identified a valid waiver of the sovereign immunity applicable in Texas to school districts. *See, e.g. City of Houston v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011) (governmental units such as school districts are immune from suit unless that immunity has been waived by the legislature);  *see also* TEX. CIV. PRAC. & REM. CODE §§ 101.001, 101.051 (under the TTCA the only permissible tort claim against a school is one based on misuse of a motor vehicle).

the existing contract interference claim are also relevant to the claim of interference with prospective contracts.  He maintains that, because he did not receive a notice regarding renewal (or termination) in the summer of 2014, as he previously had, he turned down several lucrative contracts, including one with Northwest ISD Dallas for $500,000, thinking the BISD intended to continue his existing contract. He maintains that there was a reasonable probability that he would have entered into the Northwest ISD Dallas and other prospective contracts such as DCP Midstream, Dickerson Group, Inc., and Bennett Electric. According to Walker, Appellees' actions in defaming and conspiring against him were independently tortious and unlawful, and prevented the prospective contracts from occurring.  Further, he contends that Appellees engaged in these acts with the conscious desire to prevent him from securing business from anyone in the Beaumont community and, as a result, he suffered actual harm or damage as a result of interference.

Given the nature of this claim, its survival turns on the viability  of the other tort claims asserted by Walker. Because we conclude none is successful, this one likewise fails.

## VIII.  Equal Protection and Immunity of BISD Personnel

Lastly, we briefly consider Appellants' claims asserted under 42 U.S.C. § 1983, urging equal protection violations, specifically Walker's allegations of race discrimination relative to BISD Chief Financial Officer Appellee Kingsley's allegedly onerous invoicing requirements, and the immunity of BISD Board of Managers, BISD Board of Trustees, and BISD (Employee) Appellees Butler, Covington, Saleme, and Terry Ingram. The district court dismissed the equal protection claim, concluding Walker had not alleged that similarly situated white business owners were treated differently. The district court additionally found Kingsley entitled to qualified immunity based on

objective reasonableness, i.e., Kingsley's awareness of Walker's licensing investigation by the Texas Department of Licensing and Regulation based on allegations of falsified work history, as well as being subject to criminal investigation and prosecution, and then convicted of tax fraud. Based on these facts, Walker's challenge to the district court's qualified immunity ruling on this issue is unwarranted.

Regarding Walker's assertions concerning document requests that BISD Board of Trustee Appellants Michael Neil and Tom Neild made regarding African American employees of the BISD who had attended the Texas Alliance of Black School Educators meetings, the district court found dismissal warranted because Walker had not alleged he was one of the participants. This challenge likewise is unavailing.

Appellants additionally contest the district court's dismissal of their claims on state law immunity grounds against BISD (Employee) Appellees Saleme, Covington, and Butler, who prepared the "Evaluation Matrix" utilized by the BISD in rejecting Walker's contract renewal bid in 2014, and includes the (allegedly false) statement: Previous Provider Admitted guilt to padding BISD invoices. Paid back over $2,000,000." All of these issues and rulings are discussed at length in the Magistrate Judge's August 18, 2016 Report and Recommendation and the District Judge's September 14, 2016 Order approving and adopting the Magistrate Judge's recommended rulings. We find no error in the district court's assessment.

Section 22.051 of the Texas Education Code defines "professional employee of a school district" to include superintendents, board of trustee members, and "any other person employed by a school district whose employment requires certification and the exercise of discretion." TEX. EDUC.

CODE § 22.051  The BISD Board of Managers, BISD Board of Trustees, and BISD Employees Butler, Covington, Saleme, and Ingram qualify as professional employees under § 22.051, acting within the scope of their authority.

Regarding Haynes' assault claims against Neil, involving his alleged physical removal of Haynes from blocking the doorway of a BISD press conference, the district court found that he, a member of the BISD Board of Trustees, qualified as a professional employee of the school district, and thus was entitled to dismissal based on the election of remedies provision of the Texas Tort Claims Act ("TTCA"), §101.106 of the Texas Civil Practice and Remedies Code, so long as he acted within the scope of his employment. *See* TEX. CIV. PRAC. & REM. CODE § 101.106 (suing governmental unit bars any suit or recovery against individual employee of the unit regarding the same matter). Based on §22.051 and the version of § 37.105 of the Texas Education Code in effect prior to the June 15, 2017 effective date of its 2017 amendment,[17] the District Judge determined that Neil, as a member of the Board of Trustees, qualified as a professional employee, was authorized to remove persons from school property, and thus was acting in the scope of his employment. TEX. EDUC. CODE § 22.051 (definition of professional employee of school district includes member of the board of trustees of an independent school district); TEX. EDUC. CODE § 37.105 (pre-2017 amendment) (authorizing board of trustees of a school district or authorized representative to eject any undesirable person from the property upon refusal to leave peaceably).

For that reason, the district court found that that BISD Board of Trustee member Neil was entitled to dismissal under the election of remedies provision

---

[17] *See* Acts 2017, 85th Tex. Leg., ch. 924 (S.B. 1553), § 5, eff. June 15, 2017.

of the TTCA.  We find no error in this assessment under applicable law. *See also* TEX. EDUC. CODE § 22.0511 (immunity of professional employee of school district from personal liability for act incident to or within the scope of duties that involves exercise of judgment or discretion except for using excessive force with discipline or negligence resulting in bodily injury to student).

## IX.    State-Law Civil Conspiracy

To the extent that none of Appellants' other tort claims survive, this claim likewise falls.  *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, No. 17-0630, 2019 WL 1495211, at *1 (Tex. Apr. 5, 2019) ("civil conspiracy is a derivative tort that 'depends on participation in some underlying tort'")(quoting *Tilton v. Marshall,* 925 S.W.2d 672, 681 (Tex. 1996) ("liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable")). Furthermore, Appellants' allegations of an "agreement" amongst the various groups of defendants are largely conclusory and speculative and thus legally deficient.

## CONCLUSION

Finding no reversible error in the district court's dismissal of the entirety of Appellants' claims, we AFFIRM.